**Jerry K. FORBES, Petitioner–Appellant,**

**v.**

**Clarence TRIGG, Superintendent, Respondent–Appellee.**

No. 91–2282.

United States Court of Appeals, Seventh Circuit.

Argued June 8, 1992.

Decided Sept. 15, 1992.

Rehearing and Rehearing En Banc Denied Oct. 21, 1992.

Andrew G. Klevorn, Bruce Zessar (argued), Sidley & Austin, Chicago, Ill., for petitioner-appellant.

David A. Arthur, Dist. Atty. Gen. (argued), Office of the Atty. Gen., Federal Litigation, Indianapolis, Ind., for respondent-appellee.

Before BAUER, Chief Judge,
CUMMINGS, Circuit Judge, and
FAIRCHILD, Senior Circuit Judge.

BAUER, Chief Judge.

In this appeal, we review the district court's grant of summary judgment on a petition for a writ of habeas corpus in favor of the respondent, Clarence Trigg, Superintendent of the Indiana Youth Center. The petitioner presents four challenges to the district court's denial of his petition for habeas corpus. Although we deny Forbes' petition, we find that the Indiana Department of Corrections' ("IDOC") rule which provides that offenders (inmates) and staff who are requested to serve as witnesses in disciplinary hearings are not required to appear and testify violates IND.CODE ANN. § 11–11–5–5(a)(5) (Burns 1988) and the Due Process Clause of the Fourteenth Amendment of the Constitution.

## I. Facts

Forbes was confined at the Indiana Youth Center ("IYC") in Plainfield, Indiana during 1990. On August 7, 1990, Forbes was assigned to work in the Officer's Barber Shop in the IYC Custody Building. He began work in the shop on August 15, 1990. Because the Custody Building houses the visiting room and vending machines that are serviced by outside vendors, inmates working in the building have an opportunity to meet, and potentially to exchange contraband with people from outside the prison. Because of this risk, Custody Building rules provide that inmates working in the building are subject to urine testing for illegal drug use. *See* Criteria for Offenders Assigned to the Custody Building, Issued December 15, 1989 ("Criteria"), and Rules and Regulations Governing Offenders Working in the I.Y.C. Officer's Barber Shop in the Custody Building, Issued March 23, 1990 ("Rules and Regulations"), Appellant's Appendix at 5.

Clinton Crider supervised the inmates working in the Custody Building. Crider stated in an affidavit that all Custody Building workers are tested approximately every ninety days. The Rules and Regulations were posted in the barber shop on a bulletin board approximately ten feet from Forbes' work station. *See* Crider Affidavit, Appellant's Appendix at 3. Prison officials also maintain that Forbes was informed of these rules before he began work in the shop, and received a copy of them. Forbes contends that he was never informed of the urine test requirement and that he never received a copy of the rules. Forbes also states that when he began work in the shop, Crider said he did not like Forbes because Forbes was a "jailhouse lawyer," and that he would try to have Forbes reassigned. Two days after Forbes began work, on August 15, 1990, Crider ordered a urine test for all inmates working in the Custody Building.

Forbes refused the test. Before Crider ordered Forbes to take the test, he advised Forbes of the consequences of taking the test and having a positive result, or of refusing the test altogether. In the refusal form he completed that morning, Forbes stated that he refused because "It is not against the law or rules of IYC to be a drug addict; there is no IYC policy; there is no probable cause." Health Care Services Refusal Form, Appellant's Appendix at 3. Crider charged Forbes with refusal to obey an order from a staff member, a class C offense under the IDOC Adult Disciplinary Policy (the general rules which apply to all inmates). *See* Offense No. 347, Appellant's Appendix at 6. The IYC Rules and

Regulations, Section XXII at 69 provide: *"Do what you are told* to do by any staff member. If you feel the order is unjust, *you may request to talk to a staff member* about it *after you have done as. instructed."* (emphasis in original) (quoted in *Forbes v. Trigg*, No. IP 90–1931–C, slip. op. at 4 (S.D.Ind. May 18, 1991)).

On August 21, 1990, the IYC Conduct Adjustment Board ("CAB") held Forbes' disciplinary hearing. Before the hearing, Forbes requested three witnesses: Clarence Trigg, the Superintendent of the IYC, Major Alexander, Crider's immediate superior, and Crider. Trigg and Alexander refused to appear without explanation. Crider refused to appear, stating that "I can not [sic] witness because I am the author of the [disciplinary] report." Notice to Witness/Lay Advocate, Appellant's Appendix at 8.

Forbes also filed a written motion to dismiss the charge, or "for a Finding of Not Guilty." *See* Appellant's Appendix at 10. In this motion, he acknowledged that IYC rules required him to obey staff orders, and that he received copies of these rules. Motion to Dismiss, at 1. Forbes stated, however, that because these rules did not expressly provide for urine testing, he could not be punished for refusing to obey an order requiring one until he was given a written copy of the urine-testing rule. *Id.* He also complained that the IYC's urine-testing procedure turned up false positives because samples were not frozen. Further, Forbes argued that he could not be punished for refusing to submit to the test because Crider had no reasonable suspicion or probable cause to believe he might be using drugs, and because the test was not administered randomly. Finally, Forbes complained that the CAB procedures violate due process because his witnesses were not compelled, there was insufficient evidence of his guilt, and inadequate written records were kept of CAB proceedings.

Forbes testified at the hearing. The only other evidence presented was Crider's conduct report and Forbes' Health Care Services Refusal Form. The CAB found Forbes guilty of refusing to obey a staff member's order. In the Disciplinary Hearing Report the Board made the following findings:

CAB [c]onsidered Conduct Report, offender[']s plea and testimony, the findings [a]re, by Forbes # 853165 own admission did Refuse an order on 8–15–90, when Sgt. Crider gave offender Forbes # 853165 an order to submitt [sic] to a urine specimen, Forbes Refused to submitt [sic] the urine specimen, as Reported by Credible Sgt. Crider, found Guilty.

Disciplinary Hearing Report, Appellant's Appendix at 9. The CAB changed Forbes' work assignment and deprived him of 30 days of good time. After the hearing, Forbes was segregated from the general prison population for 72 hours. Although the CAB had not ordered the segregation, Harley Crabb, the correctional officer who chaired the CAB, ordered that Forbes be segregated because he threatened Crider and another correctional officer. On August 24, Forbes was released from segregation because Crabb determined that Forbes "calm[ed] down." Affidavit of Harley Crabb, Appellant's Appendix at 13.

Forbes appealed the CAB's decision to Superintendent Trigg. Trigg affirmed the CAB's rulings, and Forbes raised a final appeal to John Nunn, the Deputy Commissioner of Operations of the IDOC. Before issuing his denial of Forbes' appeal, Nunn verified with IYC officials that the urine-testing rule had been posted in the Custody Building on a bulletin board close to Forbes' work station. *See* Memorandum from Paul O'Haver, Assistant Superintendent, IYC to John Nunn, dated August 23, 1990, Appellant's Appendix at 12. In the memo, O'Haver notes that IYC did not have a policy or procedure for urine testing, other than the posted Custody Building rule. *Id.* Nunn's denial letter states:

All materials relevant to this appeal have been reviewed and there is no evidence of procedural or due process error. The conduct report is quite clear and does support the charge. The sanctions imposed were well within the guidelines of the Disciplinary Code for Adult Offenders and you present no evidence on ap-

peal which would indicate that the action of the CAB should be modified in any way.

Nunn Appeal Denial Letter of 10/2/90, Appellant's Appendix at 11.

Forbes filed this action arguing that the CAB proceeding, the administrative review, and the IYC urine-testing rule are constitutionally infirm. Because the Indiana Supreme Court has held that Indiana courts do not have jurisdiction to review the decisions of prison disciplinary boards, *Hasty v. Broglin*, 531 N.E.2d 200 (Ind.1988), Forbes has no state judicial remedies to exhaust. In his petition, Forbes argued that his due process rights include judicial review in the Indiana state courts of the CAB proceedings. Forbes also argued that because he did not have actual notice of the urine-testing rule, he was not obliged to follow Crider's order, and could not be punished for refusing to do so. Further, Forbes contended that the urine-test rule was enforced arbitrarily and that Crider ordered the test to harass him. He renewed his claim that Crider needed probable cause or a "reasonable suspicion" of drug use to substantiate his order requiring Forbes to submit to a urine test. Forbes also challenged his inability to present witnesses at the CAB hearing and the adequacy of the written record of the hearing. He also alleged that the administrative appeal process did not provide a meaningful review of his claim. Finally, Forbes protested his placement in segregation. The district court rejected these claims and dismissed Forbes' petition on Trigg's motion for summary judgment.

## II. Analysis

■ We review a district court's grant of summary judgment *de novo*, and we accept all facts and inferences in the light most favorable to the non-moving party. *Pardo v. Hosier*, 946 F.2d 1278, 1280 (7th Cir. 1991) (citations omitted). Forbes raises four issues for review: whether genuine issues of material fact preclude summary judgment on (a) whether the urine test he was ordered to take was unreasonable, and thus violative of the Fourth and Fourteenth Amendments, and (b) whether the prison disciplinary proceedings violated due process; whether Indiana's failure to provide judicial review of disciplinary hearings violates due process; and whether the district court should have dismissed as moot Forbes' claim about his administrative segregation.

### A. Administrative Segregation Claim

■ Forbes' challenge to his administrative segregation is moot, and should have been dismissed by the district court. By the time Forbes filed his petition, he had been released from administrative segregation, and any request for less restrictive custody was therefore moot. *McCollum v. Miller*, 695 F.2d 1044, 1048 (7th Cir.1982). Federal Rule of Civil Procedure 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Trigg concedes the issue. Appellee's Brief at 32. Therefore, we vacate the district court's ruling on Forbes' administrative segregation, and remand this issue to the district court for dismissal pursuant to the provisions of Fed.R.Civ.P. 12(h)(3).

### B. Reasonableness of Urine Test

We cannot dispense with Forbes' other claims as easily. Forbes argues that the IYC's urine test was unreasonable and therefore violated the Fourth Amendment's strictures against unreasonable searches and seizures. We disagree. Forbes raises several challenges to the reasonableness of the IYC urine test. He argues that he was not given adequate prior notice that he was subject to the test, that Crider ordered the test of the Custody Building workers to harass him, and that the prison had no regulations governing the administration and processing of the tests, subjecting him to the risk of a false-positive test.

■ Urine tests are searches for Fourth Amendment purposes, and prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings. *See e.g., Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct.

3194, 82 L.Ed.2d 393 (1984) (no privacy interest in prison cell); *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (urinalysis is search for Fourth Amendment purposes). Moreover, for Fourth Amendment purposes, urinalysis is analogous to body cavity searches and blood tests. *Tucker v. Dickey,* 613 F.Supp. 1124 (D.C.Wis.1985) (urine sample analogous to blood test for Fourth Amendment purposes); *Storms v. Coughlin,* 600 F.Supp. 1214, 1220 (S.D.N.Y.1984). In *Bell v. Wolfish,* the Supreme Court examined the constitutionality of post-visitation body cavity searches. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1970), and explained that the basic test for the constitutionality of a search that invades the integrity of an inmate's body is reasonableness.

> In each case [the Fourth Amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884 (citations omitted). The Court stressed that prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* at 547, 99 S.Ct. at 1878. Further, subsequent cases have noted that "[t]he unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (citing *Block v. Rutherford,* 468 U.S. 576, 588–89, 104 S.Ct. 3227, 3233–34, 82 L.Ed.2d 438 (1984)).

Urinalysis testing is not a new issue in this (or any other) circuit. *See Draper v. City of Chicago,* 907 F.2d 152 (7th Cir. 1990) (police officers); *Taylor v. Grady,* 888 F.2d 1189 (7th Cir.1989) (correctional officers); *Dunn v. White,* 880 F.2d 1188, 1192 (10th Cir.1989), *cert. denied,* 493 U.S. 1059, 110 S.Ct. 871, 107 L.Ed.2d 954 (1990) (AIDS testing of inmates); *Spence v. Far-*

*rier,* 807 F.2d 753, 755 (8th Cir.1986) (inmates); *United States v. Williams,* 787 F.2d 1182 (7th Cir.1986) (probationer); *Storms v. Coughlin,* 600 F.Supp. 1214, 1218–20 (S.D.N.Y.1984) (urinalysis drug testing). In *Williams,* for example, we held that courts could order probationers to submit to periodic urinalysis for narcotics as a condition of parole. 787 F.2d at 1185. We determined that it was reasonable to require (as a condition of parole) a probationer who tested positive for marijuana to submit to drug screening at the direction of his probation officer. *Id.* at 1186. In *Spence,* the Eighth Circuit considered and dismissed an action by inmates seeking to bar urine testing in prisons. 807 F.2d at 755. Noting that the widespread use of narcotics plagues penal institutions, the court found that urine testing is a reasonable means of combating the problem. *Id.*

■ Forbes does not contest that prison authorities may conduct urine tests; he complains about the way in which the IYC Custody Building test was administered. His first contention, that he did not have adequate notice of the testing requirement is without merit. Forbes does not contest that the IYC rule requiring all inmates working within the Custody Building to submit to urine tests was posted ten feet from his work station. Forbes also was informed of the policy when he and his fellow inmates were taken to the prison hospital for testing. This rule had been in place months before Forbes was assigned to the Custody Building, and Sergeant Crider stated in his affidavit that he personally informed Forbes of the requirement before Forbes began working. Forbes' denial of this assertion does not create a genuine issue of material fact because of the posted rules. A prisoner cannot ignore posted rules, a verbal notice on the test day, and then assert that he lacked notice of the test.

Forbes relies on *Storms v. Coughlin,* 600 F.Supp. at 1221, for the proposition that any procedure that allowed IYC correctional officers to know whom they were going to test violates the Fourth Amend-

ment. In *Coughlin*, however, the issue was whether a test that was supposed to be administered randomly was in fact random, because the prison official selecting inmates to be tested simply selected cards bearing their names from a bulletin board. *Id.* at 1223. The court explained that "[s]o long as [the official] is potentially aware of the name of the prisoner he is choosing the commander may, consciously or unconsciously, steer his choices toward less favored inmates." *Id.* The testing process at issue here, however, does not present the same concerns.

All inmates in the Custody Building were subject to periodic testing, the only question was when the test would be administered. We agree with Trigg that if the tests were performed on a schedule known to the inmates, the test's ability to detect illegal drug use would be reduced, if not eliminated. Crider has testified that the test was administered approximately every ninety days. Forbes asserts that the timing of the test was suspicious because it occurred only two days after he came to the Custody Building, and that Crider could have ordered all the inmates to be to be tested to cover up his harassment of Forbes. Appellant's Brief at 14 n. 6. We reject these assertions.

Moreover, the Eighth Circuit has held in a similar case that, where a prisoner is given verbal orders, and advance notice and "at least one chance to conform his conduct to the order before any disciplinary proceeding was commenced," the requirements of due process are satisfied. *Meis v. Gunter,* 906 F.2d 364, 367 (8th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 682, 112 L.Ed.2d 673 (1991). In *Meis,* the inmate argued that his due process rights were violated because he was not given access to all administrative regulations, operational memoranda, and other documents that contain standards of conduct for inmates. *Id.* at 365. This argument is analogous to Forbes' demand that the IYC produce an inmate's written acknowledgement that he has received notice or copies of all rules which could be the subject of a correctional official's order before it can sanction the inmate for refusing to obey an order. *See* Appellant's Brief at 7, n. 3. As the court in *Meis* explained, such fastidious notice procedures are not required in order for the prison to enforce its officers' verbal orders. *Id.* at 366. We agree with the warning in *Meis* that a total lack of notice and opportunity to comply with a rule could violate due process, but that scenario is not presented here. The example given by the court in *Meis* is enlightening:

> [if the prison] makes it an offense for an inmate to have in his cell more than three books, and if an inmate, not knowing of the [rule], has four books in his cell, and if an officer, upon discovering the four books, institutes disciplinary proceedings against the inmate without first informing him of the three-book limit and giving him a chance to get rid of the fourth book, obviously problems of due process arise.

*Id.* at 367. Despite Forbes' allegations, he has not been subject to this kind of draconian handling. *See Coffman v. Trickey,* 884 F.2d 1057 (8th Cir.1989) (inmate punished for knowing violation of published rule when no rule existed), *cert. denied,* 494 U.S. 1056, 110 S.Ct. 1523, 108 L.Ed.2d 763 (1990). Due process requires that inmates receive fair notice of a rule before they can be sanctioned for its violation. *Id.*

Again, we believe Forbes received fair notice. The undisputed facts show that the notice of the urine test requirement was posted ten feet from Forbes' work station, Crider informed Forbes that he was subject to the test and the consequences of refusing the test or testing positive and gave him a chance to submit before he reported Forbes for refusing to obey his order. Forbes argues that *Taylor v. Perini,* 413 F.Supp. 189 (N.D.Ohio 1976) holds that posting is an insufficient form of notice of rules. But he neglects to point out that posting was insufficient in that case only "in view of the transitory effect of such postings." *Id.* at 235. There has been no allegation that the posting of rules in the Custody Building was temporary or transitory. In fact, the urine-testing requirement was in effect and posted from March

1990. Therefore, we find *Taylor* of limited assistance.

Further, the danger discussed in *Storms* and other cases is that posed by random drug tests that are not really random because prison officials choose which inmates will be tested. Correctional officials could harass particular inmates by subjecting them to repeated tests. In this case, the danger of this kind of harassment is illusory; all the inmates were tested. Forbes was not singled out by Crider—in fact, following Forbes' line of reasoning, Crider could not enforce any Custody Building rules against Forbes without raising the specter of harassment. We refuse to accept the supposition that a urine test of all inmates conducted at the same time, under the same conditions, could constitute harassment of one of the inmates.

▮ Forbes also challenges the reasonableness of the urine test based upon the IYC's lack of published procedures for implementing and handling them. He says the lack of published procedures exposed him to the risk of a false positive result because of improper handling. *See* Appellant's Brief at 14. We reject this claim. The IYC is not required to publish the testing procedures it follows when it analyzes a specimen for narcotics. Of course the IYC must use scientifically sound testing procedures, *see, e.g., Spence v. Farrier,* 807 F.2d 753, 756 (8th Cir.1986); *Wykoff v. Resig,* 613 F.Supp. 1504 (N.D.Ind.1985); *Storms v. Coughlin,* 600 F.Supp. 1214, 1225 (S.D.N.Y.1984), but an inmate cannot refuse to be tested simply because he has not seen and approved the institution's testing protocol. We also point out that Forbes has not alleged that the means of collecting the samples was unnecessarily intrusive or harassing. *Cf. Tucker v. Dickey,* 613 F.Supp. 1124, 1126 (W.D.Wis.1985) (inmate awakened at 5:00 a.m., handed bottle and copy of official statement, and ordered to produce specimen). Further, as the district court pointed out, if Forbes' concern is over the lack of a published schedule for the tests, there is no unfairness in the IYC's refusal to publish testing dates because concealing test dates from inmates is necessary in order for the tests to be useful detectors of illicit drug use. Further the ninety-day testing interval is not so frequent as to suggest harassment, and the testing of all inmates removes the danger that a particular inmate could be singled out and harassed. *Forbes v. Trigg,* No. IP 90–1931–C, slip op. at 9 (Mar. 18, 1991).

### C. Adequacy of the Hearing Procedures

We now turn to Forbes' claim that his disciplinary hearing violated his due process rights. In evaluating constitutional claims of prisoners, we must balance the need to protect prisoners' procedural rights against the need for prison safety and security. *See Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1973). We review procedural due process claims in two steps: we determine whether there was a deprivation or interference with a protected liberty or property interest, and then, whether the procedures attendant upon the deprivation or interference were constitutionally sufficient. *Kentucky Department of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989).

In this case the parties do not contest that Forbes was deprived of a protected liberty interest—"good" or "credit" time. *See* IND.CODE ANN. § 35–50–6–3, –4 (Burns 1988); *Thompson,* 490 U.S. at 461, 109 S.Ct. at 1909; *Superintendent v. Hill,* 472 U.S. 445, 453–54, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1984) (outlining procedures inmate must receive where a prison disciplinary hearing may result in loss of good time credits); *Wolff v. McDonnell,* 418 U.S. 539, 561, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1973). *See also* Disciplinary Hearing Appeal, Response of Superintendent Trigg, Appellant's Appendix at 10 ("As this case does involve grievous loss, you may appeal to the final reviewing authority."). At issue, then, is whether the disciplinary proceeding which imposed the penalty (deprivation of 30 days credit time) provided constitutionally adequate procedures. In *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 2974–75, 41 L.Ed.2d 935 (1973), the Court held that the strictures of due

process imposed by the Fourteenth Amendment apply to prison disciplinary proceedings. Nevertheless,

> the fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed.... In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application.

*Id.* at 557, 94 S.Ct. at 2975. (citations omitted).

The Court outlined the procedural protections to which inmates are entitled in disciplinary proceedings. *Id.* at 566, 94 S.Ct. at 2980. They may call witnesses and present documentary evidence when it "will not be unduly hazardous to institutional safety or correctional goals." *Id.* Although "the right to present evidence is basic to a fair hearing ... the unrestricted right to call witnesses from the prison population carries the obvious potential for disruption." *Id.* The Court emphasized that prison officials retain "the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority...." *Id.*

The IDOC rule allowing correctional officials complete discretion to appear at disciplinary hearings is analogous to the policy rejected in *Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1984), where prison officials argued that no reason need be given for refusing to call a witness. The Court disagreed.

> [T]o hold that the Due Process Clause confers a circumscribed right on the inmate to call witnesses at a disciplinary hearing, and then conclude that no explanation need ever be vouched for the denial of that right, either in the disciplinary proceeding itself or if that proceeding be later challenged in court, would change an admittedly circumscribed right into a privilege conferred in the unreviewable discretion of the disciplinary board.

*Real,* 471 U.S. at 498, 105 S.Ct. at 2197. Before *Real,* the Fourth Circuit held that a prison policy that provided that an inmate has only the right to present "voluntary" witnesses (either inmates or correctional personnel, or others) at a disciplinary hearing, violated the prisoner's due process rights. *Dalton v. Hutton,* 713 F.2d 75, 78 (4th Cir.1983). In *Dalton,* the inmate was accused of inciting to riot or rioting. In his defense, the inmate asked two prison officers to serve as witnesses. Both declined; one gave no reason, the other stated that because of prior charges he made against the inmate he would not testify. *Id.* at 76. At the inmate's hearing only the officer charging him with the offense testified, and the inmate denied the charge. The inmate was sentenced to isolation and lost all accumulated good time. *Id.* at 77.

The court explained that the right of an inmate to call witnesses remains a part of the "substantive foundation of procedural Due Process for inmates." *Id.* (citing *Bartholomew v. Watson,* 665 F.2d 915, 918 (9th Cir.1982)). Like Respondent here, the Virginia prison officials argued that it is only the witness's refusal to testify that affected the inmate's rights, not the prison rule itself. The court rejected this argument:

> We conclude that it is just such a restriction to unrestrained "voluntariness" that exceeds the boundaries of constitutional fairness. One needs no "right" to call a witness who voluntarily presents himself. If there is preclusion of an entire class of witnesses (i.e., anyone who would rather not appear), the right is dissipated in a cloud of verbiage. An inmate granted the right, albeit qualified, to call witnesses in his behalf loses it altogether, if any witness may refuse to testify for no reason whatever.... Even if such restrictions are valid as applied (e.g. testimony unduly hazardous to the witness, institutional safety or correctional goals), *per se* proscriptions against the calling of certain categories of witnesses are violative of the Supreme Court's admonition that "the decision to preclude the calling of witnesses should be made on a case-by-case analysis of the

potential hazards which may flow from the calling of a particular person."

*Id.* at 78 (quoting *Bartholomew,* 665 F.2d at 918). The court found the regulation that permitted only voluntary witnesses was equivalent to no regulation, and that its failure to require a case-by-case analysis of the calling of involuntary witnesses violated the tenets of *Wolff.* Witnesses are "especially critical" in the prison context, the court found, because the inmate begins with a credibility problem. *Id.* Constitutional policy demands that disciplinary committees encourage staff and residents to appear when asked to do so. *Id.*

We find the Fourth Circuit's reasoning persuasive. Other circuits have also relied upon *Dalton* in holding that rules which categorically bar certain classes of witnesses are unconstitutional. For example, in *Ramer v. Kerby,* 936 F.2d 1102, 1104 (10th Cir.1991), the court reviewed a prison policy that required prisoners to submit written questions for prospective staff-member witnesses. If the disciplinary committee chairperson found the questions relevant, the chairperson contacted the staff member for a written response. Ramer, the inmate, refused to submit questions. The court noted the Supreme Court's suggestion that "it would be useful for the Committee to state its reasons for refusing to call a witness, whether it be for irrelevance, lack of necessity, or *the hazards presented in individual cases." Id.* at 1104 (citing *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980) (alteration in original). *Ramer* echoed *Dalton*'s finding that this language has been interpreted to require that prison officials determine on a case-by-case basis whether permitting an inmate to call or confront a particular witness would threaten institutional safety or correctional goals. *Id. See King v. Wells,* 760 F.2d 89, 93 (6th Cir.1985) ("*Wolff* requires that officials make an individualized decision on the facts of each case."); *Bartholomew v. Watson,* 665 F.2d 915, 918 (9th Cir.1982) (holding unconstitutional policy prohibiting inmates from calling staff members as witnesses without proof of facts establishing threat to institutional safety).

In *Ramer,* the Tenth Circuit found the policy prohibiting prisoners from calling staff members as witnesses deprives inmates of the process due in a prison disciplinary proceeding. 936 F.2d at 1104. The court reaffirmed that prison officials must decide on a case-by-case basis "whether legitimate penological concerns including, but not limited to, safety or correctional goals, expense, staffing requirements throughout the institution, and the danger of harassment, counsel against permitting the requested staff members to appear at the hearing." *Id.*

Similarly, in *Hayes v. Walker,* 555 F.2d 625, 629 (7th Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977), this court noted that "due process does not permit the automatic exclusion of the right to call witnesses." We explained in *Hayes* that some support for a denial of a request for witnesses must appear in the record in order to prevent arbitrary denials of a prisoner's right to call witnesses which would render the right meaningless. *Id.* at 630.

We believe these cases are dispositive. IDOC's rule that allows inmates and staff members to refuse to testify at disciplinary hearings without explanation violates the Due Process Clause of the Fourteenth Amendment. If the rule incorporated a determination by the disciplinary committee that the factors that excuse testimony set forth in IND.CODE ANN. § 11–11–5–5(a)(5) (Burns 1988) have been satisfied, the rule would be constitutional. Section 11–11–5–5(a)(5) outlines acceptable reasons to refuse to allow a requested witness. The Constitution requires that a determination be made on a case-by-case basis that requested witnesses pose institutional problems. *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979–80. Again, we acknowledge that the "inmate's right to present witnesses is necessarily circumscribed by the penological need to provide swift discipline in individual cases ... [and] by the very real dangers in prison life which may result from violence or intimidation directed at either other inmates or staff." *Ponte v. Real,* 471 U.S. 491, 495, 105 S.Ct. 2192, 2195, 85 L.Ed.2d 553 (1984) (citing *Baxter v. Palmigiano,*

425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)).

The IDOC rule eviscerates the inmate's right to present witnesses. It vests unreviewable discretion to appear in correctional officials (like the charging officer) and other inmates who may have played significant roles in an inmate's disciplinary charge and punishment. Therefore, we hold that the rule that permits correctional officials and inmates to refuse to appear at whim is unconstitutional, and encourage the Indiana Department of Corrections to enact a new rule consistent with the provisions of IND.CODE ANN. § 11–11–5–5(a)(5) (Burns 1988) and this opinion.

■ Notwithstanding the infirmities of IDOC rule, we do not believe that as applied to Forbes, it violates his due process rights, or that he is entitled to a new hearing. *See Dalton,* 713 F.2d at 78. The Indiana statute provides that irrelevant or repetitive testimony need not be admitted. IND.CODE ANN. § 11–11–5–5(a)(5), (6)(C). In this case, Forbes was disciplined for failing to follow Crider's order. Forbes presumably wished to call Trigg and Major Alexander to question them about the urine-testing policy. But the CAB was not required to reevaluate the test, only to verify that the rule existed, had been posted, and that Crider informed Forbes of the rule before he charged him with refusing to obey his order. The existence of the rules and their provisions could be verified by documentary evidence, rendering any testimony from Trigg and Alexander repetitive, and unnecessary under the statute. Because the test was reasonable, there was no evidence Forbes could present to justify his refusal to follow Crider's order. He did not dispute that he refused to follow the order, only that he was not required to submit to the test.

In any other context, where the underlying facts of the charged misconduct are in issue, the testimony of the charging officer would be relevant (and perhaps indispensable), and prison officials would have to offer some penological justification (such as those outlined in the Indiana statute) for refusing to call such a witness. As to the other requested witnesses, Trigg and Alexander, we believe the district court was correct in finding that Due Process did not require their presence. Their testimony could have added little. Requiring high-ranking correctional officials who are not involved in the charged conduct to testify presents the danger that inmates might abuse the opportunity, disrupting the institution and undermining those officials' authority. *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2980; *Ramer,* 936 F.2d at 1134. Although we are not entirely comfortable with this inquiry given the procedural context of this case, we do not believe genuine issues of material fact bar our judgment. Even given the benefit of all reasonable inferences, we do not believe on these facts, that the denial of witnesses violated Forbes' due process rights.

■ Forbes' other challenges to the administrative proceedings merit less discussion. He contends that the written record prepared by the CAB was inadequate and that he was not accorded meaningful administrative review. In *Wolff v. McDonnell,* 418 U.S. 539, 564–65, 94 S.Ct. 2963, 2978–79, 41 L.Ed.2d 935 (1974), the Court held that "there must be a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action." *See also Pardo v. Hosier,* 946 F.2d 1278, 1284 (7th Cir.1991); *Culbert v. Young,* 834 F.2d 624 (7th Cir.1987), *cert. denied,* 485 U.S. 990, 108 S.Ct. 1296, 99 L.Ed.2d 506 (1988); *Saenz v. Young,* 811 F.2d 1172 (7th Cir.1987); *Hayes v. Walker,* 555 F.2d 625, 621–633 (7th Cir.1977); *Jackson v. O'Leary,* No. 89–C–7383, 1992 WL 38403, at *2, 1992 U.S.Dist. LEXIS 2108, at *11 (N.D.Ill. Feb. 24, 1992). *Compare Brown v. Frey,* 807 F.2d 1407, 1413 (8th Cir.1986) (requiring less in written statement than *Hayes* and *King* ). In this case, the CAB provided the following written statement:

CAB [c]onsidered Conduct Report, offender[']s plea and testimony, the findings [a]re, by Forbes # 853165 own admission did Refuse an order on 8–15–90, when Sgt. Crider gave offender Forbes # 853165 an order to submitt [sic] to a

urine specimen, Forbes Refused to submitt [sic] the urine specimen, as Reported by Credible Sgt. Crider, found Guilty. Disciplinary Hearing Report, Appellant's Appendix at 9. In *Pardo*, we approved two written statements that were as limited, if not more so, than the one issued by the CAB following Forbes' hearing:

> [B]ased on resident's statements and officer's report the committee is convinced resident violated AR 804 by cursing, making improper and disrespectful remarks to an employee and thereby causing a general disturbance.

> [B]ased on resident's statements and officer's report the committee is convinced resident violated AR 804 by cursing, making improper and disrespectful remarks to an employee and thereby causing a disturbance.

*Pardo*, 946 F.2d at 1284. We also have approved a summary that stated only, "Officer Fabry's written statement supports the finding of guilt that an attempt was made by Inmate Saenz to commit battery upon the [other] inmate." *Saenz*, 811 F.2d at 1173–74. *See also Culbert v. Young*, 834 F.2d 624, 627 (7th Cir.1987) (approving similar statement). In this case, the CAB was not required to reevaluate the constitutionality of the Custody Building urine-testing policy in order to find that Forbes refused to obey Crider's order. Any other rule would require the CAB to reevaluate the policy every time an inmate tested positive or refused the test. The CAB's statement "furnishes to the inmate both the grounds for the decision and the essential facts upon which the inferences are based," *Hayes v. Walker*, 555 F.2d 625, 632 (7th Cir.1977), and thus is constitutionally sufficient.

■ Forbes' challenges the adequacy of the Department of Corrections' administrative review of the CAB's holding are also without merit. He relies upon *Smith v. Stoner*, 594 F.Supp. 1091 (N.D.Ind.1984), for the proposition that administrative review must be meaningful, and not "merely pro forma." *Id.* at 1110. *Smith* is correct, but the facts in that case are a far cry from those presented here. In *Smith*, the CAB provided no written statement explaining the sanctions imposed or the reasons for their imposition, and the reviewing official examined only the notices of the violations, witness statements on charges that were dismissed, and prison disciplinary forms with a box marked guilty. *Id.* at 1101. Moreover, the reviewing officer did not review the substance of the CAB's finding, but only looked to see that the steps of the disciplinary procedure were timely. *Id.* at 1110. Such "review" is obviously constitutionally inadequate.

In contrast to the procedures afforded the inmate in *Smith*, Forbes' claims were substantively reviewed by two administrative officers. Superintendent Trigg reviewed and rejected Forbes' appeal on September 14, 1990 (Disciplinary Hearing Appeal, Appellant's Appendix at 10). Forbes asserts that Trigg's review was meaningless because he approved the CAB's action before Forbes lodged his appeal. This assertion misapprehends IDOC Disciplinary Policy procedures. In an uncontested affidavit, Trigg explained that as Superintendent of the IYC, he reviews all the CAB's guilty findings. Notwithstanding this review, Trigg has granted appeals of CAB rulings. *See* Trigg Affidavit at 3, Appellant's Appendix at 4.

John Nunn, Deputy Commissioner of IDOC reviewed and denied Forbes' appeal on October 2, 1990. Before ruling on Forbes' appeal, he verified that the rules requiring Custody Building workers to submit to urine tests were posted in the Building. *See* Memorandum from Paul O'Haver to John Nunn, dated 8/23/90, Appellant's Appendix at 12. Nunn wrote to Forbes twice—first, on August 27, 1990, explaining that a formal IDOC policy was not required before Custody Building employees could be tested for drugs. *See* Appellant's Appendix at 12. He wrote to Forbes again on October 2, 1990, denying Forbes' appeal. There is no indication that this administrative review was not substantive or meaningful. Further, Forbes' contention that because these officers used language similar to that used in other administrative rulings, they failed to consider his claims, is without merit. *See* Appellant's

Brief at 25. Simply because an administrative officer relies to some degree on boilerplate language in dismissing appeals does not mean that the review was not meaningful. In fact, Trigg's affidavit reveals that there are approximately 300 cases heard by the CAB each month. Of these, about 60 result in findings of not guilty. Trigg Affidavit at 3, Appellant's Exhibit at 4. Given the volume of cases, the Constitution does not require the CAB or its reviewing officers to come up with hundreds of unique ways of saying "you lose" each month. Meaningful review does not require creative writing. In fact, this court relies on boilerplate in certain contexts, such as dismissing appeals for lack of jurisdiction and denying petitions for rehearing. We doubt that Forbes would suggest that because of the boilerplate, parties before this court were denied "meaningful" review. Forbes has failed to present evidence that the IDOC's administrative review was constitutionally inadequate, and we dismiss this claim.

### D. State Judicial Review

■ Finally, Forbes argues that the Fourteenth Amendment requires Indiana to provide judicial review of state prisoners' federal constitutional claims. The Indiana Supreme Court has held that Indiana courts do not have jurisdiction to hear such claims. *See Hasty v. Broglin*, 531 N.E.2d 200 (Ind.1988); *Bates v. State*, 426 N.E.2d 404 (Ind.1981); *Riner v. Raines*, 274 Ind. 113, 409 N.E.2d 575 (1980). The United States Supreme Court has twice granted certiorari on the question of whether the Due Process Clause requires state judicial review of federal constitutional claims. *See Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1984); *Case v. Nebraska*, 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1964). In both cases, the Court declined to decide the issue. We also decline. Although this is a significant question, and some state courts and at least one district court have reviewed it, *see, e.g., Richardson v. Miller*, 716 F.Supp. 1246, 1257–60 (W.D.Mo.1989) (thoroughly reviewing issue); *Prock v. District Court of Pittsburg County*, 630 P.2d 772

(Okla.1981), we do not believe we should decide this issue in a case where a prisoner has been accorded a judicial forum, albeit a federal one, in which to raise his claims. We also note that our decisions in *Miller v. Duckworth*, 963 F.2d 1002 (7th Cir.1992), and *Harris v. Duckworth*, 909 F.2d 1057, 1058 (7th Cir.1990), bind our decision on this claim. Thus we leave further resolution of this issue for the Supreme Court, if that Court chooses to address it.

### III. Conclusion

For the foregoing reasons, we VACATE the district court's ruling on Forbes' administrative segregation, and remand this issue for dismissal pursuant to the provisions of Fed.R.Civ.P. 12(h)(3); we AFFIRM the district court's judgment on the remaining claims, but find the IDOC rule that provides that offenders (inmates) and staff requested to serve as witnesses in disciplinary hearings are not required to appear and testify (IDOC Adult Disciplinary Policy at 22, Appellant's Appendix at 6), is unconstitutional, and encourage the IDOC to enact a rule in conformity with this opinion.