**Ronnie McKINNEY, Petitioner,**

v.

**Craig HANKS, and Indiana Attorney General, Respondents.**

**James CHAPMAN, Petitioner,**

v.

**Daniel McBRIDE, and Indiana Attorney General, Respondents.**

Nos. 3:95–cv–0610 AS, 3:95–cv–0642 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 20, 1995.

Ronnie McKinney, Carlisle, IN, pro se.

Robert D. Bugher, Indiana Department of Correction, Indianapolis, IN, for Indiana Attorney General, respondent Craig Hanks, Daniel McBride.

### MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

### I. PRELUDE

 Many United States district judges and United States magistrate judges who must work daily in the trenches of the federal trial judiciary, dealing with the current massive flow of *pro se* prisoner cases brought under 28 U.S.C. § 2254 challenging the decisions of prison disciplinary boards, are most respectfully concerned about the newly created boundaries found in *Sandin v. Conner*, — U.S. —, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).[1] One is reminded by the sugges-

---

1. The result and reasoning of *Sandin* has been discussed recently in the following cases: *Anderson v. Romero*, 72 F.3d 518 (7th Cir.1995); *Clayton v. Morris*, 1995 WL 686352 (7th Cir. Nov. 17, 1995), *Jones–Bay v. Wright*, 1995 WL 687661 (7th Cir. Nov. 16, 1995); *Williams v. Ramos*, 71 F.3d 1246 (7th Cir.1995); *Neal v. Fairman*, 1995 WL 649923 (7th Cir. Nov. 2, 1995); *Matthews v. Duckworth*, 65 F.3d 170 (7th Cir.1995); *Zarnes v. Rhodes*, 64 F.3d 285 (7th Cir.1995); *Whitford v. Boglino*, 63 F.3d 527 (7th Cir.1995); *Sasnett v. Sullivan*, 908 F.Supp. 1429 (W.D.Wis.1995); *Bryant v. Peters*, 1995 WL 708566 (N.D.Ill. Nov. 30, 1995); *Whittmore v. Washington*, 1995 WL 646391 (N.D.Ill. Oct. 23, 1995); *Robinson v. Howell*, 902 F.Supp. 836 (S.D.Ind.1995); *Stone–Bey v. Swihart*, 898

tion earlier in this century by G.K. Chesterton that a fence should not be torn down until it is known why it was built in the first place. Those who must deal daily with this species of § 2254 prison disciplinary cases must wonder with some precision what old fences have been torn down and what new ones have been built. In this context of prisoner litigation, the earlier fence-building, as far as the concept of protectable liberty interest under the Fourteenth Amendment, largely is found in such cases as *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and maybe *Superintendent, Mass. Corr. Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). The hard question remains as to which, if any, of these judicial fences created in the decades of the 1970's and 1980's have now been torn down or moved in the 1990's. Although the task is burdensome, a side-by-side comparison of *Hewitt v. Helms* and *Sandin v. Conner* is helpful in order to put the exact changes made by the Supreme Court in *Sandin* into context. Clearly, the classical liberty interest created under *Hewitt* in this species of cases has now been given a decent judicial burial, with the grave-side services presided over by the same judicial officer who was present at its creation. That part of the understanding of the *realpolitik* teaching of *Sandin* is easy. What remains tryingly difficult is the determination of what new fences have been built to replace the ones created by *Hewitt,* and where these fences are now located. Interesting and difficult language has been chosen by the Supreme Court as the standard by which a deprivation of liberty in the prison disciplinary context should be judged. A prison will now run afoul of the Fourteenth Amendment (or in some instances the Fifth Amendment) when it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* —— U.S. at ——, 115

S.Ct. at 2300. The decision does not end there but in reality directs us to turn back and look at the expected parameters of the sentence imposed. Specifically, whether "discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law." *Id.,* at ——, 115 S.Ct. at 2301.

As is so often the case, there is an interrelationship, or at least an attempted interrelationship, between cases brought under 28 U.S.C. § 2254 and those brought under 42 U.S.C. § 1983. *See Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), and *Allen v. Duckworth,* 6 F.3d 458 (7th Cir.1993), *cert. den.,* —— U.S. ——, 114 S.Ct. 1106, 127 L.Ed.2d 417 (1994). Such is also the case in *Sandin.* The factual setting of *Sandin,* which involved an inmate receiving disciplinary segregation for a comparable short period (30 days), is literally legion in cases filed pursuant to § 2254 in the United States district courts. However, there are also literally thousands of such cases where disciplinary segregation has been imposed not for a few days or a few weeks, but in terms of years. Thus, in the spectrum of prison disciplinary cases and the determination of the presence of protectable liberty interests for inmates, the task of determining where these new fences are now located will fall to the United States district judges and United States magistrate judges, leaving to higher authority the decision as to where and when to build and tear down these new fences down in the future. Whatever else may be said with regard to the *Sandin* majority, it will not take a Brandeis brief to establish that the real workload of the federal trial judiciary will be greatly increased as the result of the *Sandin* decision, although clearly such was not the intent or purpose of its majority. With all of this said as a preliminary, this court has chosen a couple of recently filed cases invoking 28 U.S.C. § 2254 in the prisoner disciplinary context to see how these new boundaries work out.

F.Supp. 1287 (N.D.Ind.1995); *Kirsch v. Franklin,* 897 F.Supp. 1173 (E.D.Wis.1995); *Martinkoski v. Wisconsin Dept. of Corrections,* 896 F.Supp. 882 (E.D.Wis.1995); *Van Dyke v. Washington,* 896

F.Supp. 183 (C.D.Ill.1995); *Taifa v. Bayh,* 1995 WL 646300 (N.D.Ind. Aug. 22, 1995); *Oswalt v. Godinez,* 894 F.Supp. 1181 (N.D.Ill.1995); and *Sanchez v. Roth,* 891 F.Supp. 452 (N.D.Ill.1995).

## II. *McKINNEY v. HANKS*

The pro se petitioner Ronnie McKinney filed a petition on July 21, 1995, invoking 28 U.S.C. § 2254. The return filed by the Attorney General of Indiana on October 6, 1995, demonstrates the necessary compliance with *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir.1982). The petitioner was at all relevant times an inmate at the Indiana State Prison in Michigan City, Indiana, in this district, and was the subject of proceedings before a Conduct Adjustment Board (CAB) there. More accurately, he was the subject of two such proceedings. One was Case Number ISP 92–11–103, in which he was charged by Correctional Officer Jerry Lambert with a violation of Adult Disciplinary Policy Code (ADPC) 215, namely, destroying, altering or damaging state property or property belonging to another. The report of conduct more specifically stated the following:

> At approximately 11:15 a.m. on Nov. 1, 1992, I, Ofc. J. Lambert was on the bottom range, east side of I.D.U. detention unit and observed inmate McKinney kicking his toilet and jerking on his bed. I, Ofc. J. Lambert, told inmate McKinney to stop damaging the cell, but inmate McKinney refused and stated that he was pissed off and hyper and continued lifting the bed and slamming it to the floor, and kicking his toilet stool. The cell was flooded due to inmate McKinney kicking the toilet loose from the wall. At approx. 11:30 inmate McKinney was removed from his cell and taken to N.S.B. lock-up unit.

McKinney was given a notice of disciplinary hearing on November 30, 1992, and the CAB proceeding was held on December 2, 1992. He entered a plea of not guilty, requested the assistance of a certain lay advocate and indicated that written statements would be presented at the hearing. The report of the disciplinary hearing, dated December 7, 1992, shows that McKinney denied the allegations in the report of conduct. He asserted that the particular toilet was already broken. The CAB presented its findings of fact and statement of evidence relied upon in making these findings, and found by a preponderance of the evidence that inmate McKinney did damage the toilet in his cell when he kicked it loose from its fittings. He was sanctioned for restitution of damaged property and given six (6) days disciplinary segregation, which time had already been served. He did not appeal the CAB findings and sanctions administratively within the Department of Corrections.

The second case involving McKinney is ISP 92–11–149. This case arose out of a report of conduct dated November 26, 1992, issued by Correctional Officer Sherman O. Wilson, which cited McKinney with another violation of ADPC 215, namely, destroying, altering or damaging state property or property belonging to another. The report of conduct charged inmate McKinney with tearing his toilet off the wall, picking it up and throwing it back on the ground. McKinney received a copy of the report of conduct on December 3, 1992. A notice of disciplinary hearing reveals that on December 3, 1992, inmate McKinney was given notice that a CAB proceeding was to be held December 7, 1992. He entered a plea of not guilty, requested the assistance of a lay advocate to present his case and requested that certain officers and offenders appear as witnesses at the hearing. The report of the disciplinary hearing dated December 7, 1992, shows that McKinney admitted that he damaged the toilet in his cell because he was angry at another offender. The CAB presented its findings of fact and statement of evidence relied upon. The CAB found that even though inmate McKinney entered a plea of guilty to the offense, he did in fact damage state property namely the pipes and plumbing hardware in his cell when he tore the toilet off the wall. The sanctions imposed by the CAB included restitution for property damage and eight (8) days in disciplinary segregation, which was in effect time served.

In this case, inmate McKinney appealed the CAB findings and sanctions to Superintendent Farley at the ISP on December 11, 1992. In this appeal, McKinney argued that he was denied effective assistance by the lay advocate and that he was subjected to double jeopardy since the CAB assessed restitution and disciplinary segregation for his violation of the ADPP. The superintendent, upon review of the appeal and record of CAB proceeding, upheld the conviction, finding that

there was sufficient evidence to support the CAB's decision. McKinney then appealed his CAB conviction to the Department of Corrections Disciplinary Review Manager of Adult Operations, who on February 23, 1993, denied his appeal, finding that there was no evidence of procedural due process error in this case.

In this habeas petition, McKinney claims a denial of his due process rights in these disciplinary matters. With respect to cause number ISP 92–11–103, McKinney asserts that the case was heard by a single hearing officer instead of a multi-member panel, thus violating his due process rights. As to cause number ISP 92–11–149, he claims that he was denied effective assistance by a lay advocate and that his guilty plea was unlawfully induced. Finally, McKinney claims that he was denied due process when the superintendent of the ISP did not dismiss or otherwise remand the decisions of the CAB.

In ISP 92–11–103, petitioner McKinney failed to meet the demands of *Markham v. Clark*, 978 F.2d 993 (7th Cir.1992), which this court presumes to have survived *Sandin* unscathed. In ISP 92–11–149, this petitioner is apparently attempting to make an argument commonly made in criminal cases regarding ineffective assistance of counsel under the Sixth Amendment of the Constitution of the United States, as found in such cases as *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, the Sixth Amendment of the Constitution of the United States has never been given significant application to these kinds of CAB proceedings.

Certainly, the concept of the lay advocate is found in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), as more recently discussed in *Miller v. Duckworth*, 963 F.2d 1002 (7th Cir.1992). The decisions in *Miller*, if not *Wolff*, narrow significantly the area in which it is required that a prisoner inmate be provided a lay advocate. In *Miller*, the standard seems to be that an inmate must be so illiterate or the issue so complex that the inmate would be unable

himself to collect and present the evidence necessary for an adequate comprehension of the case. *Miller*, 963 F.2d at 1004. A request for a lay advocate did not prevail in *Miller* which was rationalized under *Wolff*. In ISP 92–11–149, this petitioner fails under both *Wolff* and *Miller* to *require* the appointment of the lay advocate.

With regard to the plea of guilty in ISP 92–11–149, this court does not conceive that either a pre-*Sandin* or post-*Sandin* analysis requires the strict application of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), to prisoner CAB proceedings. Certainly, there is often an interrelationship between assertions of ineffective assistance of counsel under *Strickland, supra,* specifically in cases involving guilty pleas, *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), and in those cases that arise under the Sixth Amendment of the Constitution of the United States in state court criminal proceedings. Apparently, what the lay advocate did in this case, and what thousands of lawyers do in criminal courtrooms every day, is that he advised the inmate to plead guilty in the hopes that nothing would happen to him. This is not a case of a binding plea bargain under *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). Certainly, a lay advocate may make a recommendation, but this recommendation is not binding on the CAB. In this case, inmate McKinney was advised of the possible sanctions which could be imposed by the CAB, including the possibility of restitution made payable to the State of Indiana for the property damaged. There is no case law either before or since *Sandin* that gives any solace to inmate McKinney in this regard.

McKinney's final claim seems to be based upon an argument based upon *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In this context, McKinney must make a *Superintendent v. Hill* argument, that is he must establish that the CAB's decision was not supported by "some evidence" in the record. *Superintendent,* 472 U.S. at 454, 105 S.Ct. at 2773. Under *Superintendent,* this court finds that the evi-

dence in both of the CAB proceedings was sufficient to support the conclusions there announced.

Therefore, there is no basis for relief here stated under the Constitution of the United States as it was interpreted by the Supreme Court either in *Sandin,* before *Sandin,* or by various lower courts, inferior courts in Article III of the Constitution, since *Sandin.* In the case of Ronnie McKinney, there is simply no basis for any kind of relief, and therefore, the court hereby **DENIES** Mr. McKinney's petition for writ of habeas corpus.

### III. *CHAPMAN v. McBRIDE*

The court now turns to cause no. 3:95cv0642, in which the petitioner is James Chapman, appearing *pro se,* with a petition seeking relief under 28 U.S.C. § 2254. The return filed by the respondents on November 3, 1995, demonstrates the necessary compliance with *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir.1982).

This petitioner is now housed at the Indiana Reformatory in Pendleton, Indiana, which is within the territorial boundaries of the Southern District of Indiana. However, the relevant conduct in this case occurred while inmate Chapman was incarcerated at the Westville Correctional Center ("WCC") in Westville, Indiana, in this district. At the WCC, Chapman was the subject of proceedings held in March 1995 before a Conduct Adjustment Board ("CAB"). A report of conduct was issued on March 12, 1995, alleging a violation of Adult Disciplinary Policy Procedure Code 213, namely, threatening another with bodily harm or with an offense against person or property. A report of conduct specified that Chapman's conduct required his placement into disciplinary segregation, an issue which requires close attention especially in this post-*Sandin* world.

The particular conduct charged against inmate Chapman occurred when lunch was being served, apparently cafeteria style, and he demanded a "no-pork" tray. One of the correctional officers explained to Chapman that the particular diet line did not honor no-pork diet as per instructions. Apparently, Chapman became verbally abusive, threatening that members of the Muslim faith would create havoc and bloody trouble in the dining room, and that somebody would have to pull the bodies out. He then sat down and apparently attempted to get other inmates around him involved. He later returned to the diet line window and called one of the correctional officers there a "European motherfucker." This court notes that many courts have clearly held that inmates belonging to certain religious groups, specifically inmates of the orthodox Jewish or Islamic faith, may be entitled to a pork-free diet so long as institutional security is not threatened by such an accommodation to the inmates' religious beliefs. *See, Kahane v. Carlson,* 527 F.2d 492 (2d Cir.1975); *Ross v. Blackledge,* 477 F.2d 616 (4th Cir.1973); *Barnett v. Rodgers,* 410 F.2d 995 (D.C.Cir.1969); *Masjid Muhammad–D.C.C. v. Keve,* 479 F.Supp. 1311 (D.Del.1979). However, it is not entirely clear in this record as to whether this petitioner, James Chapman, falls into the category of an inmate who is entitled to a pork-free diet. Nonetheless, that is the central subject matter of the reported conduct.

A notice of disciplinary hearing was given on or about March 16, 1995, and a CAB proceeding was had on March 23, 1995, where Chapman entered a plea of not guilty to the charges against him and requested a particular lay advocate. He also requested that two other offenders appear as witnesses at the hearing. *See Forbes v. Trigg,* 976 F.2d 308 (7th Cir.1992), *cert. den.,* 507 U.S. 950, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993). The hearing was held before the CAB on March 23. At that hearing, inmate Chapman stated that he did not threaten anyone, but he did admit to calling a staff member a "European." The findings in this particular case are worthy of verbatim quotation.

> After reviewing the CR, incident report, witness statements, offender's and LA comments, the CAB finds guilty of threatening based on the CR in which Chapman stated to Mr. Cook that he was a member of a "psoriatic Muslim nation and that they would create such a havoc and bloody trouble in the dining room that somebody would have to pull the bodies out."

The CAB imposed the following sanctions on inmate Chapman: (1) he was reduced from

Credit Class II to Credit Class III; (2) he received one-year disciplinary segregation; and (3) he was deprived of twenty-nine (29) days of earned time. He appealed the findings and sanctions to the superintendent of the WCC, where he argued that there was insufficient evidence to support the finding of guilt, that his due process rights as established in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), were violated and that the sanctions imposed him were too severe for the violation. Upon review, the superintendent upheld the conviction, finding that there was sufficient evidence to support Chapman's conviction. Chapman then appealed to the Department of Corrections Disciplinary Review Manager of Adult Operations, apparently attempting to comply with *Markham v. Clark*, 978 F.2d 993 (7th Cir.1992), but he did not succeed.

█ It needs to be noted that this case was filed on August 3, 1995, and that the response memorandum of the Attorney General of Indiana was filed on November 3, 1995, both dates being post-*Sandin*. This court has no difficulty with the Attorney General's argument with regard to the sufficiency of evidence here under *Superintendent, Mass. Corr. Institution at Walpole v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and does not believe, at least in this case, that the evidentiary standards there established were disturbed in *Sandin*. It would appear that *Viens v. Daniels*, 871 F.2d 1328 (7th Cir.1989), is still alive and well. *See also Hamilton v. O'Leary*, 976 F.2d 341 (7th Cir.1992). However, there is a section of the response memorandum of the Attorney General of Indiana (which, incidentally, is not paginated), beginning on page five that is worthy of verbatim quotation here:

> Chapman next claims that he was denied due process because he did not receive the due process requirements mandated in IC 11–11–5(a)(5). Since these protections mirror the protections required by *Wolff v. McDonnell*, and Chapman received all required due process protections, this argument is baseless.
>
> The sanctions of deprivation of earned credit time and a demotion in credit time earning class for prison disciplinary offenses are deprivations of "liberty" protected by the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974); *Superintendent v. Hill*, 472 U.S. 445, 453, 105 S.Ct. 2768, 2772, 86 L.Ed.2d 356 (1985). Therefore a writ of habeas corpus under 28 U.S.C. § 2254 is an appropriate remedy for these sanctions. *Harris v. Duckworth*, 909 F.2d 1057, 1058 (7th Cir.1990).

It is of no small moment to this court that the response brief filed by the Attorney General of Indiana, in which arguments were made concerning the presence of liberty interest under *Wolff*, contained not a word mentioning the Supreme Court's decision in *Sandin*. It is not for this court to attempt to make an argument on behalf of the Attorney General of Indiana, but surely by now the attorneys in that office should be keenly aware of the problems that inhere in *Sandin* and should be prepared to address them. Fortunately for the Attorney General in this case, it may not make a great deal of difference. This may not be a case where the boundaries for determining whether a liberty interest is present have been significantly altered as between *Wolff* and *Sandin*. However, implicit in the Attorney General's argument with regard to the creation of a liberty interest under Ind.Code § 11–11–5(a)(5) is an invocation of *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), a discussion which is no longer valid nor necessary. In this case, this court has no trouble at all finding that the CAB's decision is supported by "some evidence" in the record as required under *Superintendent*, 472 U.S. at 454, 105 S.Ct. at 2773. It would also appear in this post-*Sandin* world that *Rasheed–Bey v. Duckworth*, 969 F.2d 357 (7th Cir.1992) remains alive and well, and certainly *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) remains highly significant authority and stands as an inhibition on the exercise of federal jurisdictional authority.

There is an additional issue presented in this case which is disturbing, to say the least. It is not for this court to suggest that *Forbes v. Trigg*, 976 F.2d 308 (7th Cir.1992), *cert. den.*, 507 U.S. 950, 113 S.Ct. 1362, 122 L.Ed.2d 741 (1993), *may* be in tension with *Sandin*. Here, there may be some factual

distinctions between the two. In *Sandin*, the inmate requested that prison guards be present at the disciplinary hearing so that they could be called as witnesses, but they were absent because they were fulfilling their duties elsewhere in the prison. Here, Chapman requested that inmate witnesses be present at his CAB hearing to provide testimony. However, these witnesses, namely offenders Williams and Golden, only were allowed to submit their testimony in writing, which apparently conforms to the demands of *Forbes*. Inmate Chapman was also represented by his requested lay advocate and testified himself at the hearing. Under either pre- or post-*Sandin* standards, the sanctions imposed do not suffer from any constitutional infirmity. Therefore, the court hereby **DENIES** Mr. Chapman's petition for writ of habeas corpus.

## IV. CONCLUSION

Therefore, for the foregoing reasons, this court now **DENIES** Mr. Kinney's petition for writ of habeas corpus filed in cause no. 3:95–cv–0610AS, and **DENIES** Mr. Chapman's petition for writ of habeas corpus filed in cause no. 3:95–cv–0642AS.

**IT IS SO ORDERED.**