In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 22-1194
BRIAN OROZCO, as Administrator of the
Estate of Gregory Koger,
 Plaintiff-Appellant,

 v.

THOMAS J. DART and COOK COUNTY, ILLINOIS,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:14-cv-06361 — Maria Valdez, Magistrate Judge.
 ____________________

 ARGUED SEPTEMBER 23, 2022 — DECIDED APRIL 6, 2023
 ____________________

 Before RIPPLE, ROVNER and BRENNAN, Circuit Judges.
 BRENNAN, Circuit Judge. Cook County Jail staﬀ searched
Gregory Koger’s cell on October 5, 2013. That search sparked
lengthy litigation, including two prior visits to this court.
Koger alleges that the oﬃcers who conducted the search re-
moved approximately 30 books from his cell and disposed of
them. Seeking to hold the County responsible, Koger ﬁled suit
under 42 U.S.C. § 1983. Though his allegations have evolved,
2 No. 22-1194

Koger lands on a claim that the County deprived him of his
books without due process. The district court granted sum-
mary judgment to the County, and we aﬃrm. Koger received
constitutionally suﬃcient due process surrounding any prop-
erty deprivation, and he presents insuﬃcient evidence to hold
the County liable under Monell v. Department of Social Services,
436 U.S. 658 (1978), and its progeny.
 I
 A
 The following facts are drawn from the evidentiary record
developed during the parties’ motions for summary judg-
ment.
 In July 2013, Koger began serving a 300-day sentence in
Cook County Jail. While incarcerated, he received 42 books
and a magazine through the mail. Per Jail policy, inmates can
keep no more than three books or magazines (excluding reli-
gious texts) in their cell at any time. Koger had approximately
30 volumes in his cell at the time of the search. The three-book
policy is contained in the Inmate Information Handbook
(“Handbook”) which is given to all inmates upon arrival. The
policy states that any items or property—in excess of the
amounts allowed—is considered contraband. It is undisputed
that Koger received a copy of the Handbook.
 Inmates with excess books have a few options. They can
mail them out of the Jail using large manila envelopes and
postage available for purchase through the Jail commissary.
Indigent inmates may request postage from a Correctional
Rehabilitation Worker, but Koger maintained at least one
hundred dollars in his inmate trust account at all relevant
times. In addition, inmates can have someone outside the Jail
No. 22-1194 3

pick up personal property. Inmates are also free to donate
their books to other inmates. And if an inmate believes that
Jail staﬀ has mishandled his personal property, he may use
the Inmate Request and Grievance Procedures.
 Though the three-book policy has long been in eﬀect, it
was not strictly enforced during Koger’s stay. As a result, it
was common for inmates to have more than three books in
their cells. Despite historically lax enforcement, in October
2013 the Jail prepared to conﬁscate excess reading materials.
Koger testiﬁed that Jail administrators warned him they
would soon search inmate cells and take excess books:
 Well, we had heard from other decks that [Jail
 staﬀ] had already shaken down their cells. And
 in the days leading up to that, there were ad-
 ministrators of the Cook County Jail who came
 into our deck and told us you can only have
 three books. Not verbatim, but something along
 the lines of get rid of any more books than three
 books because we’re coming to take that stuﬀ.
Though Koger “knew that this was coming” he did not try to
divest himself of his excess books, “[b]ecause they were [his]
books” and “[t]here was no reason for [him] to get rid of the
books.”
 On October 5, 2013, Sergeant Peter Giunta’s team of six
correctional oﬃcers searched the cells on Koger’s tier. Accord-
ing to Koger, Giunta’s team took all but three books from his
cell. Koger testiﬁed that he never saw any of the conﬁscated
books again. He wrote a grievance after his books were re-
moved, but he decided not to ﬁle it.
4 No. 22-1194

 Testimony from other inmates, including Gerald Washing-
ton, Jerry Collins, Jovanny Martinez, and others supports
Koger’s account of the search. Kevin Long, another fellow in-
mate, oﬀers additional details in his Declaration. 1 Long states
he saw conﬁscated books packed into large garbage bags fol-
lowing the October 5th search, though he apparently recov-
ered some of his own books after speaking with correctional
oﬃcers.
 The County disputes Koger’s account of the search and
provides its own supporting evidence. Jail records conﬁrm
that a search took place on October 5th, but the search report
does not mention conﬁscated books. On that point, Giunta
testiﬁed that if his oﬃcers had taken books, he would have
written about it in the search report or an incident report.
Giunta also testiﬁed that he does not remember any books or
magazines being removed from the searched cells. A genuine
factual dispute thus exists about whether any books were
taken and, if they were, what became of them. Koger acknowl-
edges this point on appeal.
 Given that Koger seeks recovery from Cook County, a mu-
nicipality, it is also necessary to examine the record for evi-
dence of County policies or customs. As discussed, it is
undisputed that the County has an express written policy lim-
iting an inmate to three books in his cell. But the parties ap-
parently agree that the Jail has no written policy on what

 1 The County moved to strike the Declaration of Kevin Long based on

Koger’s alleged failure to disclose Long as a witness pursuant to the Fed-
eral Rules of Civil Procedure. The district court denied that motion as
moot after awarding summary judgment to the County. Because the
County prevails despite our consideration of Long’s account, we view the
objection as immaterial.
No. 22-1194 5

happens to books in the event Jail staﬀ conﬁscates them. Ei-
ther way, neither party identiﬁes such a policy.
 Koger claims the County’s policy is “to not have any pol-
icy,” thus entrusting guards with “total discretion to do what
they want with inmates’ conﬁscated books.” In Koger’s brief
he argues this “creates a high risk of erroneous deprivations.”
This position has some record support. Daniel Moreci was the
Jail’s ﬁrst assistant executive director at time of deposition. 2
When asked “[w]hat happens to books or magazines that are
conﬁscated from inmates” when a cell search reveals “[c]lut-
ter, [un]sanitary conditions, contraband … [or] security con-
cerns,” he responded that such reading materials are “[m]ost
likely destroyed, thrown in the garbage.” Moreci later an-
swered “No” when asked whether correctional oﬃcers are
“supposed to ask which books and magazines the inmate
would like to keep” prior to conﬁscation. This accords with
Koger’s account of the search, as well as those of his fellow
inmates.
 In response, the County provides evidence that it does not
instruct correctional oﬃcers to summarily destroy inmate
property. Giunta testiﬁed to the only procedure he recalls us-
ing to enforce the three-book policy:
 I would basically interview the inmate and let
 him know that he has an excessive amount of
 whether it be books or magazines, and that he’s

 2 In a district court motion, the County objected to Koger calling

Moreci a Federal Rule of Civil Procedure 30(b)(6) witness. After siding
with the County on summary judgment, the district court dismissed this
motion as moot. Because we likewise rule for the County, Moreci’s desig-
nation is inconsequential.
6 No. 22-1194

 generally allowed three, but pick the ones you
 want. The rest I would bag. I would place in a
 bag or some type of box … and it would be—it
 would be the inmate’s responsibility to have
 them either sent home or to have some family
 member or someone else come and pick them
 up for [the inmate].
And when asked how correctional oﬃcers are supposed to
deal with an inmate’s excess personal property, former Exec-
utive Director Scott Kurtovich testiﬁed, “Either remove it or
have the ability to have him send that excess stuﬀ home via
US Mail out to his family; or have his family even pick it up,
believe it or not.”
 Cook County Department of Corrections General Order
14.7 states: “Items in your possession that have not been pro-
vided or approved by the [Jail] will be considered contraband,
conﬁscated and a Disciplinary Report will be completed.”
While that Order suggests Disciplinary Reports are manda-
tory, Moreci testiﬁed that creation of a formal report is left to
the “common sense” of the oﬃcer and supervisor. In Moreci’s
time with the County, he had “never seen a disciplinary re-
port state that [an inmate was] being written up because [he
had] too many books or magazines.”
 Regardless of how the Jail handles conﬁscated books, the
record conﬁrms that enforcement of the three-book policy
was rare. See, e.g., Roman Declaration (“In my whole time at
the jail, I have seen the rule enforced three times … .”); Mar-
tinez Declaration (“During my time at the jail, I have only
rarely seen this rule enforced against inmates.”); Collins Dec-
laration (“In my experience, the jail rarely enforces this
rule.”); Washington Declaration (“Correctional Oﬃcers knew
No. 22-1194 7

that many inmates had more than that number of books, but
they never enforced the rule limiting the number of books we
were allowed to keep in our cells.”).
 The Jail released Koger from custody on October 24, 2013,
and he passed away in 2020. Though Brian Orozco has taken
over the suit as administrator of Koger’s estate, throughout
this opinion we attribute Orozco’s arguments to Koger.
 B
 The procedural history of this case is extensive and signif-
icant. Koger’s legal action against the County began on Au-
gust 18, 2014, when he ﬁled a complaint in federal district
court. The thrust of that initial complaint diﬀers from Koger’s
current position. Koger ﬁrst alleged that the three-book policy
violated the First Amendment. Among other arguments, he
asserted that the three-book policy “unreasonably and irra-
tionally censors and restricts [inmates’] ability to receive in-
formation,” and thus infringes First Amendment rights.
 The district court granted summary judgment to the
County in September 2017. The court ruled that two addi-
tional litigants lacked standing to sue and that Koger had no
standing to seek injunctive relief. On the merits, the court de-
termined that Koger could not show municipal fault. Speciﬁ-
cally, the court concluded that any deprivation of Koger’s
books was attributable to the negligent or intentional wrong-
doing of Jail staﬀ, not a Jail policy or custom.
 On appeal, this court aﬃrmed in part and reversed in part.
Lyons v. Dart, 901 F.3d 828 (7th Cir. 2018). We agreed with the
district court’s standing analysis, id. at 829–30, but remanded
for additional fact-ﬁnding on Koger’s First Amendment
claim. Id. at 830. Due to “Koger’s allegation that the
8 No. 22-1194

conﬁscation of his reading material was authorized by the
Jail’s policy,” we sent the case back to determine “exactly
what policy the Jail is employing, how (if at all) it aﬀected
Koger, and if necessary consider the validity of that policy
and whether Koger is entitled to damages.” Id.
 Back in the district court, Koger sought leave to ﬁle an
amended complaint with a procedural due process claim. The
district court denied that motion, identiﬁed “no due process
claim in the case,” and awarded summary judgment to the
County again in June 2019. Koger moved for reconsideration,
and in September 2019, the district court again ruled for the
County but expanded its analysis. In short, the district court
determined that the three-book policy did not violate the First
Amendment and reiterated that Koger had not properly
pleaded a due process claim.
 Once more this court aﬃrmed in part and reversed in part.
Koger v. Dart, 950 F.3d 971 (7th Cir. 2020). As to the First
Amendment claim, we agreed with the district court that the
three-book policy is constitutionally valid. Id. at 974. But we
concluded that the district court should have evaluated
Koger’s due process claim. “Complaints plead grievances, not
legal theories,” so we remanded with instructions that the dis-
trict court consider the due process claim on its merits. Id. at
974, 976. With that, Koger returned to the district court a third
time—and lost on summary judgment a third time. After ad-
ditional proceedings on Koger’s due process claim, the dis-
trict court held, “Koger was on notice of the three-book rule
in the Handbook, was given multiple in-person warnings,
and had opportunities to divest himself of his excess books
through various means.” So even if the County was responsi-
ble for permanently depriving Koger of his books, he received
No. 22-1194 9

constitutionally adequate procedural protections. Koger
again sought reconsideration, but the district court denied his
motion. Orozco, as administrator of Koger’s estate, appealed
to this court.
 II
 Koger appeals from a grant of summary judgment to the
County, so our review is de novo. Barnes v. City of Centralia,
943 F.3d 826, 828 (7th Cir. 2019) (citing Tapley v. Chambers, 840
F.3d 370, 376 (7th Cir. 2016)). In analyzing the record, we con-
strue all facts and reasonable inferences in nonmovant
Koger’s favor. Id. Summary judgment is properly awarded
when “the admissible evidence shows that there is no genuine
issue as to any material fact and that the moving party is en-
titled to judgment as a matter of law.” Hanover Ins. Co. v. N.
Bldg. Co., 751 F.3d 788, 791 (7th Cir. 2014) (citing FED. R. CIV.
P. 56(c)). We will not grant summary judgment if a “dispute
about a material fact is ‘genuine,’ that is, if the evidence is
such that a reasonable jury could return a verdict for the non-
moving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986). But “[a] party who fails to produce evidence suﬃ-
cient to establish an element essential to that party’s case on
which they bear the burden of proof cannot survive a sum-
mary judgment challenge.” Stockton v. Milwaukee County, 44
F.4th 605, 614 (7th Cir. 2022) (citation omitted). 3

 3 One additional procedural point: Koger and the County both moved

for summary judgment in the district court, but on appeal Koger does not
press his motion. Appellant’s Brief at 23 n.12. So, we exclusively analyze
the County’s motion and treat Koger as the nonmoving party throughout.
10 No. 22-1194

 Koger brings his claim under 42 U.S.C. § 1983 which, in
relevant part, prohibits a person acting under the color of state
law from depriving a U.S. citizen of “any rights, privileges, or
immunities secured by the Constitution and laws” of the
United States. By way of his § 1983 claim, Koger alleges a vi-
olation of his Fourteenth Amendment due process rights. The
Due Process Clause of the Fourteenth Amendment requires
states to provide citizens with adequate procedural protec-
tions relative to certain deprivations, a violation of which is
actionable under § 1983. Zinermon v. Burch, 494 U.S. 113, 125
(1990). To establish a due process claim, Koger must show
two things: “(1) deprivation of a protected interest and (2) in-
suﬃcient procedural protections surrounding that depriva-
tion.” Tucker v. City of Chicago, 907 F.3d 487, 491 (7th Cir. 2018)
(quoting Michalowicz v. Vill. of Bedford Park, 528 F.3d 530, 534
(7th Cir. 2008)).
 A
 Koger’s alleged protected interest here is a property inter-
est in his books, which he asserts the Jail unlawfully seized
and destroyed. We agree with Koger that he has a protected
interest in his books and, construing the facts favorably to
him, we assume for purposes of summary judgment that the
Jail deprived Koger of that protected property interest.
 An interest in property is a protected interest for purposes
of procedural due process. Bd. of Regents of State Colleges v.
Roth, 408 U.S. 564, 569–70 (1972). Under normal circum-
stances, books plainly qualify as property. But the analysis is
more complex in the jail context. Per the Handbook, any
books in an inmate’s cell beyond the allotted three qualify as
contraband. The County points to this policy and argues that
inmates have no protectable property interest in items
No. 22-1194 11

deemed contraband. Koger disagrees on the impact of the pol-
icy, arguing that the contraband status of the books may limit
an inmate’s right to possess the excess reading materials in his
cell, but it cannot instantly extinguish an inmate’s property in-
terest in those materials. On this point, the district court found
a protectable property interest in the excess books, writing
that “the Seventh Circuit’s statements in this case foreclose
[the County’s] contention.”
 We agree with the district court. Koger had a continuing
property interest in the books, even if the three-book policy
deems them contraband. The County’s position to the con-
trary does not square with our prior holding in Koger, 950 F.3d
at 975. There, the County argued “that the books (in excess of
three) were contraband, which public oﬃcials may seize and
destroy without notice, hearings, or compensation.” Id. In re-
sponse, we explained, “That proposition is far from clear:
That public oﬃcials call something contraband does not make
it so.” Id. Continuing, we recognized “Excess books may be a
kind of contraband, but only while in the cell.” Id. Unlike co-
caine or other banned substances, books are generally permit-
ted in public and in jail. Indeed, “Cook County acknowledges
that Koger could have mailed the books home an hour before
the search and that the outbound books would not have been
seized and destroyed.” Id. We also recognized that Illinois
“has adopted by statute a long list of items classiﬁed as con-
traband inside prisons,” but “[b]ooks are not on that list.” Id.
(citing 720 ILL. COMP. STAT. 5/31A-0.1). Therefore, Koger did
not lose a property interest in his books by virtue of having
too many of them.
 United States v. Miller, 588 F.3d 418 (7th Cir. 2009), illumi-
nates this distinction. We found that case instructive in Koger,
12 No. 22-1194

950 F.3d at 975–76, and we continue to do so. There, the
United States charged Miller with a felony and seized his ﬁre-
arms. Miller, 588 F.3d at 418. Upon conviction, Miller became
ineligible to possess his seized ﬁrearms, meaning the govern-
ment could not return them to him. Id. at 418–19. But the
government had also failed to timely pursue a forfeiture pro-
ceeding for the guns. Id. This created an impasse. The guns
could not go back to Miller, but the government was not enti-
tled to keep them either. The district court initially ordered
the weapons destroyed, but we reversed that decision. Id. at
419–20. Identifying several alternatives to destroying the
ﬁrearms or returning them to Miller, we held that “Miller’s
property interest in the ﬁrearms continues even though his
possessory interest has been curtailed.” Id. at 420.
 In Koger, we drew a parallel. “What was true of Miller is
true of Koger too: he lost a possessory interest in the books by
keeping too many in his cell, but he did not automatically lose
his property interest.” Koger, 950 F.3d at 975. This remains
true. The Jail’s policy limited Koger’s possessory interest in
his books but could not immediately extinguish his property
interest in them. Still, “[p]roperty interests are created and de-
ﬁned by state law,” so Illinois law could conceivably divest
Koger of a property interest in the excess books. United States
v. Knoll, 785 F.3d 1151, 1156 (7th Cir. 2015) (quoting Butner v.
United States, 440 U.S. 48, 55 (1979)). But the County identiﬁes
no such law.
 The County points to Webb v. Lane, a state appellate court
decision, but that case is neither controlling nor persuasive.
583 N.E.2d 677, 679 (Ill. App. Ct. 1991). In Webb, a prison
staﬀer discovered Webb with cash and conﬁscated it perma-
nently. Id. No Illinois statute deﬁned cash in prison as
No. 22-1194 13

contraband, but a Department of Corrections regulation did.
Id. at 679, 683. The Illinois state court held that Webb had “no
protected property interest in the possession of unauthorized
currency,” so he could not prevail on a procedural due pro-
cess claim. Id. at 686.
 Per the County, it follows from Webb that inmates lack a
property interest in contraband books. But two reasons per-
suade us that Webb’s holding does not apply here. First, the
prison regulation at issue in Webb dealt with currency, which
received special treatment under the prison’s rules. Id. at 679.
Per Department Rule 501.230, the prison treated unauthor-
ized currency diﬀerently than other excess property contra-
band. Id. Indeed, the prison rules stated that unauthorized
cash was to be permanently conﬁscated, but “other unauthor-
ized or excess property” not involving drugs, weapons, or al-
cohol could be shipped out of the prison or collected by an
outsider. Id. (citation omitted). Cash was thus unique within
the prison’s policy scheme, and Webb concerned only cash. We
do not read Webb to hold that inmates automatically lose a
property interest in an item just because a jail policy deems it
contraband. See Koger, 950 F.3d at 975.
 Second, the prison regulation in Webb banned prisoners
from possessing currency. “Pursuant to Department Regula-
tion 504, possession of money is made a punishable of-
fense … .” Webb, 583 N.E.2d at 682 (citation omitted). Not so
for the books here. Inmates are entitled to have books in Cook
County Jail so long as they do not have more than three at any
given time in their cell. Therefore, Webb neither establishes
that Illinois jails may destroy anything deemed contraband,
nor does it hold that inmates have no property interest in ex-
cess books. We decline to change course from our earlier
14 No. 22-1194

opinion in this case. Koger continued to have a property in-
terest in his books, even after he accumulated more than
three. “We have seen before, and rejected, an argument that
items deemed contraband only because found in the wrong
hands may be summarily destroyed.” Koger, 950 F.3d at 975.
We again reject that contention here.
 This holding does not end the ﬁrst step of the due process
analysis, though. It is not enough for Koger to have a protect-
able property interest in the books. The County must have
deprived him of that interest. Koger contends that the Jail de-
stroyed or otherwise disposed of all his books and claims that
a gap in the County’s policies was the moving force behind
the deprivation. 4 In response, the County denies that Jail em-
ployees ever took Koger’s books. The County further argues
that—even if a deprivation occurred—the loss of property
cannot be attributed to a County policy or custom. As such,
the parties dispute what happened to the books and who is
responsible.
 At the summary judgment stage, we “construe facts favor-
ably to the nonmoving party” and draw all reasonable infer-
ences in that party’s favor. Lox v. CDA, Ltd., 689 F.3d 818, 821
(7th Cir. 2012) (quoting Bagley v. Blagojevich, 646 F.3d 378, 388
(7th Cir. 2011)). Koger is the nonmoving party here, so we take
as true his contested assertion that the Jail personnel disposed
of all his books, depriving him of a protected interest in his
property.

 4 When questioned at oral argument about what kind of policy Koger

alleges for purposes of municipal liability, counsel responded: “It’s a gap
in the policies where a policy was absolutely necessary.” Oral Arg. at 7:43–
48.
No. 22-1194 15

 B
 The next step in the due process analysis asks what pro-
cess the County aﬀorded Koger and whether that process is
constitutionally adequate. We conclude that the County af-
forded Koger all the process he was due under the Constitu-
tion. Thus, even if a County policy caused the destruction of
Koger’s books, his claim fails.
 As noted above, we assume at all times that Jail staﬀ de-
stroyed Koger’s books. And when analyzing the process
Koger was given, we also temporarily assume that the County
is responsible for that deprivation. This extra assumption al-
lows us to isolate the procedural component of the due pro-
cess inquiry for now, though we return to the merits of
Koger’s municipal liability theory later.
 A procedural due process claim requires the deprivation
of a protected interest and “insuﬃcient procedural protec-
tions surrounding that deprivation.” Cannici v. Vill. of Melrose
Park, 885 F.3d 476, 479 (7th Cir. 2018) (quoting Michalowicz,
528 F.3d at 534). In other words, the bare fact that a state has
deprived someone of a protected interest is not inherently un-
constitutional. “[W]hat is unconstitutional is the deprivation
of such an interest without due process of law.” Zinermon, 494
U.S. at 125 (citation omitted). Therefore, we “ask what process
the State provided, and whether it was constitutionally ade-
quate.” Id. at 126.
 1. Process Provided to Koger
 We begin with the pre-deprivation process the County
provided. Koger received notice of the three-book policy in a
number of ways. All agree that the Jail provides inmates with
the Handbook, which expressly limits the number of non-
16 No. 22-1194

religious books or magazines that an inmate may have in his
cell to no more than three and deﬁnes excess books as a type
of contraband. We previously held that policy constitutional
in Koger. 950 F.3d at 974. Because Koger had access to the
Handbook and an opportunity to apprise himself of its rules,
he had constructive notice of the three-book policy. The
County also provided ancillary notice by way of its General
Orders. General Order 14.7 tells inmates “[i]tems in your pos-
session that have not been provided or approved by the
CCDOC will be considered contraband, conﬁscated and a
Disciplinary Report will be completed.”
 Beyond paperwork, Koger received pre-conﬁscation no-
tice from Jail staﬀ. Koger testiﬁed that before the deprivation
administrators told him “something along the lines of get rid
of any more books than three books because we’re coming to
take that stuﬀ.” Koger was thus instructed prior to the depri-
vation that he needed to get rid of his extra books. That warn-
ing was not a dead letter, as Koger had several options at his
disposal for divesting himself of the books. Inmates are per-
mitted to purchase large envelops through the commissary
and use them to send outgoing mail. Koger always had
enough money in his inmate account to aﬀord shipping sup-
plies, though Correctional Rehabilitation Workers can assist
with mailings for indigent inmates. Koger could have also
worked with a Correctional Rehabilitation Worker to organ-
ize a pickup of his personal property. The Handbook pro-
vides that “[Correctional Rehabilitation Workers] assigned to
[an inmate’s] living unit can help [inmates] with questions
about [their] … personal property.” The Handbook further
states “[Inmates] may authorize an individual to retrieve
[their] personal property.” An individual outside the Jail
No. 22-1194 17

could have traveled to the Jail and collected Koger’s books.5
Finally, Koger could have donated his surplus books to other
inmates. It is undisputed that inmates are permitted to give
away reading materials to other inmates.
 Instead, Koger chose to retain his excess books after the
Jail staﬀ warned him of the impending search and conﬁsca-
tion. He saw no reason to get rid of his excess books because
they belonged to him. Like all inmates, Koger was entitled to
use the grievance process to seek redress, including post-dep-
rivation, if he believed that the Jail had mishandled his per-
sonal property. Koger wrote such a grievance but chose not to
submit it.
 2. Constitutional Suﬃciency of Provided Process
 Having identiﬁed the process aﬀorded to Koger, we next
decide whether it was constitutionally adequate. “Due pro-
cess, as [the Supreme Court] often has said, is a ﬂexible con-
cept that varies with the particular situation.” Zinermon, 494
U.S. at 127. It only requires “such procedural protections as
the particular situation demands.” Grant v. Trs. of Ind. Univ.,
870 F.3d 562, 571 (7th Cir. 2017) (quoting Riano v. McDonald,
833 F.3d 830, 834 (7th Cir. 2016)). And “[t]he essential require-
ments of due process … are notice and an opportunity to

 5 In the district court, Koger argued that the portion of the Handbook

authorizing release of property to individuals outside the Jail pertains
only to property “a detainee is required to relinquish upon being pro-
cessed into the jail,” and not “property that inmates may possess in their
cells,” such as books. But the relevant portion of the Handbook states,
without limitation, “You may authorize an individual to retrieve your per-
sonal property.” At least two witnesses also testified that property, like
books, can be released to people outside the Jail. Koger offers no contrary
evidence.
18 No. 22-1194

respond.” Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546
(1985).
 The County claims the process that was provided to Koger
is constitutionally adequate. Koger disagrees, primarily argu-
ing that the County owed him additional process between the
conﬁscation of his books and their destruction. Relatedly,
Koger asserts that the County’s policy “creates a high risk of
erroneous deprivations” because of the discretion it grants to
correctional oﬃcers” For Koger, that risk is in tension with
Mathews v. Eldridge, 424 U.S. 319, 334–35 (1976), and could be
remedied without great burden on the Jail. The district court
sided with the County, ﬁnding that Koger received all the
process he was due under the Fourteenth Amendment.
 The factors in Mathews guide our inquiry into whether the
County provided constitutionally suﬃcient process. 6 See
Simpson v. Brown County, 860 F.3d 1001, 1006 (7th Cir. 2017)
(“The general test for determining what process is due and
when was set out in Mathews … .”). Those three factors are:
 First, the private interest that will be aﬀected by
 the oﬃcial action; second, the risk of an errone-
 ous deprivation of such interest through the
 procedures used, and the probable value, if any,
 of additional or substitute procedural safe-
 guards; and ﬁnally, the Government’s interest,

 6 Koger’s argument that different interest types (i.e., possessory ver-

sus property) necessarily “demand different types of process” slices the
due process inquiry too thinly. Due process requires contextualized, flex-
ible analysis, and Koger cites no authority supporting a strict differentia-
tion between process due for possessory and property interests. See Mor-
rissey v. Brewer, 408 U.S. 471, 481 (1972). So, we fully examine the process
surrounding Koger’s deprivation.
No. 22-1194 19

 including the function involved and the ﬁscal
 and administrative burdens that the additional
 or substitute procedural requirement would en-
 tail.
Mathews, 424 U.S. at 335.
 The parties oﬀer competing applications of those factors.7
The County chieﬂy suggests that the risk of erroneous depri-
vation under the approach it took in Koger’s case is minimal.
Koger responds that the County’s chosen procedures confer
too much discretion on the Jail staﬀ, risking erroneous depri-
vation.
 Mathews Factor One. We agree with Koger that the perma-
nent deprivation of personal property, such as books, is a se-
rious private interest, so we conclude that the ﬁrst Mathews
factor weighs in Koger’s favor.
 Mathews Factor Two. This case’s outcome revolves largely
around the second factor—the risk of erroneous deprivation
through the procedures used, and the probable value of addi-
tional or substitute procedural safeguards. Id. This factor has
two components. As to the risk of erroneous deprivation un-
der the County’s procedure, we conclude that the risk is

 7 The County contends Koger waived his ability to argue the Mathews

factors, but we disagree. The Mathews factors guide the inquiry into what
process is due. See Mathews, 424 U.S. at 335 (explaining that “identification
of the specific dictates of due process generally requires consideration of
three distinct factors”). At the summary judgment stage, Koger repeatedly
argued that he was not given adequate process and cited directly to
Mathews twice. “Waiver doctrine rests on concerns about fair notice and
the proper roles of the trial and appellate courts in our adversarial sys-
tem.” Johnson v. Prentice, 29 F.4th 895, 903 (7th Cir. 2022). We have no such
concerns here given the briefing in the district court.
20 No. 22-1194

minimal. The County notiﬁed Koger upon his arrival to the
Jail that he was allowed to have three books in his cell. This
warning was given in the Handbook as well as the Jail’s Gen-
eral Orders. Koger was thus on notice that he would be taking
a risk by accumulating more than three books in his cell; he
had an opportunity at the start to comply with the policy and
to avoid all chance of deprivation. The County also notiﬁed
Koger again before taking his excess texts. When this notice
occurred is unclear, but it came days in advance of the search.
At that point, Koger once more had an opportunity to comply.
He could have mailed the books out, given them away to
other inmates, or arranged to have someone pick them up. He
chose not to pursue any of those options.
 Koger then had post-deprivation remedies at his disposal.
Per the Inmate Request and Grievance Procedures, he could
have ﬁled the grievance that he drafted but chose not to do so.
And even if Koger was soon to be released from custody, he
might have found relief. Indeed, one of Koger’s fellow
inmates reported getting back some of his books after com-
plaining to Jail staﬀ. Koger is responsible for utilizing the pro-
cedures the Jail provides. “The availability of recourse to a
constitutionally suﬃcient administrative procedure satisﬁes
due process requirements if the complainant merely declines
or fails to take advantage of the administrative procedure.”
Dusanek v. Hannon, 677 F.2d 538, 542–43 (7th Cir. 1982).
 Moving to the second component of Mathews factor two,
Koger repeatedly contends he was due additional process be-
tween the conﬁscation of his books and their destruction. He
urges that the County should have given him a post-conﬁsca-
tion opportunity to relocate his books as well as post-conﬁs-
cation notice that the books would be destroyed if he did not
No. 22-1194 21

act. But mandating such a process would essentially repeat
the procedure already provided. As Koger points out, “the
opportunity to comply means having procedures in place that
gives inmates a fair chance to discard their books in a manner
that will not result in their permanent deprivation.” That is
precisely the opportunity the County aﬀorded Koger.8 The
advance notice of the three-book policy, the in-person notice,
and the availability of the grievance procedure were constitu-
tionally adequate. Any additional policy would be
duplicative, so the probable value, if any, of further or substi-
tute procedural policies that might prevent erroneous depri-
vation is low. Mathews, 424 U.S. at 335.
 This is also not a case where a procedure of a diﬀerent
kind—such as a hearing—would have been necessary. That
Koger had excess books was obvious. That the excess books
qualiﬁed as contraband was apparent to everyone, including
Koger, who had the most opportunity to resolve the situation.
Additional or diﬀerent procedural safeguards were not con-
stitutionally required.
 Mathews Factor Three. This factor, which examines the gov-
ernment’s interest, id., also favors the County. If the Jail were
to implement a system of post-conﬁscation, pre-destruction
process, it would unavoidably entail additional administra-
tive oversight and expense. The Jail would need to organize a
system for storing conﬁscated reading materials, dedicate
space to the storage, and assign staﬀ to catalogue and date the

 8 Koger says the verbal pre-deprivation warning came too late to give

him a “realistic opportunity to protect himself from the summary destruc-
tion of his books.” But this assertion ignores the initial notice all inmates
are given of the three-book policy in the Handbook and the fact that Koger
never tried to divest himself of the excess books.
22 No. 22-1194

conﬁscated books. This all detracts from the Jail’s core func-
tion of maintaining safety and security. So, under Mathews,
Koger received constitutionally adequate process.
 This circuit’s case law on procedural due process leads to
the same conclusion as the Mathews factors. We begin with
Forbes v. Trigg, 976 F.2d 308 (7th Cir. 1992). There, an inmate
was assigned to work in the Oﬃcer’s Barber Shop, a voca-
tional learning shop in the Indiana Youth Center facility. Id. at
310. Per prison rules, inmates working at the Barber Shop
were subject to urine tests for drugs. Id. Prison oﬃcials main-
tained that Forbes received a copy of that rule and was ver-
bally informed of it. The rule was also posted on a bulletin
board near his workstation. Id. at 310, 313. Still, when the time
came for a test, Forbes refused. Id. at 310. Forbes was sanc-
tioned for his conduct, and he challenged those sanctions as a
procedural due process violation. Id. at 311–12. Discussing the
constitutional requirements of due process, this court ex-
plained that “fastidious notice procedures are not required in
order for the prison to enforce its oﬃcers’ verbal orders.” Id.
at 314 (citing Meis v. Gunter, 906 F.2d 364, 366 (8th Cir. 1990)).
From there, this court explained that if a prisoner is sanc-
tioned for a rule of which he has no notice and opportunity to
comply, then there might be a procedural due process viola-
tion. Id. In highlighting that point, this court provided a hy-
pothetical based on a similar three-book policy:
 [If the prison] makes it an oﬀense for an inmate
 to have in his cell more than three books, and if
 an inmate, not knowing of the [rule], has four
 books in his cell, and if an oﬃcer, upon discov-
 ering the four books, institutes disciplinary pro-
 ceedings against the inmate without ﬁrst
No. 22-1194 23

 informing him of the three-book limit and giv-
 ing him a chance to get rid of the fourth book,
 obviously problems of due process arise.
Id. (quoting Meis, 906 F.2d at 367). But Forbes “ha[d] not been
subject to th[at] kind of draconian handling,” so this court
identiﬁed no due process violation based on insuﬃcient no-
tice. Id.
 We recognize that Forbes dealt with sanctions and not the
deprivation of personal property, but the decision is still in-
structive on what notice is constitutionally due. If Koger was
either not warned of the three-book policy or not given ade-
quate opportunity to relocate his books, then a procedural
due process issue might lie. But Koger received both—he re-
ceived notice at least twice, and he was aﬀorded means of re-
locating his books. Accordingly, this case does not present the
risk of a due process violation like that envisioned in the
Forbes hypothetical.
 Streckenbach v. Vandensen, 868 F.3d 594, 596 (7th Cir. 2017),
examines a prison’s property release policy and notice proce-
dures, and further suggests that Koger received adequate no-
tice before the Jail took his books. There, a Wisconsin prison
policy directed that an inmate could place personal property
on deposit with prison staﬀ, to be collected within 30 days. Id.
If no one outside the prison collected the property within that
window, prison staﬀ would ship the property to the inmate’s
chosen designee at the inmate’s expense. If the inmate lacked
funds adequate to cover shipping, staﬀ would destroy the
property. Id. The prison notiﬁed the inmates of that policy in
two ways. First, it was posted on a bulletin board. Id. at 596,
598. Second, prison staﬀ would inform the inmate at time of
drop oﬀ how much the shipping would cost. Id. at 598. The
24 No. 22-1194

inmate was given no additional notice before the property de-
struction. Id. at 596. Streckenbach put his property on deposit,
and the prison—following the policy—ultimately destroyed
it. Id. Streckenbach challenged the policy on due process
grounds, claiming that the prison should have provided him
additional notice, especially between the end of the 30-day pe-
riod and the destruction of his property. Id. at 596, 598. On
review, this court observed:
 [T]he 2013 policy cannot be condemned on the
 ground that it authorizes property to be de-
 stroyed without notice. The policy itself pro-
 vides for notice—both general notice by posting
 and speciﬁc notice by calculating shipping costs
 when property is received for pickup. That it
 does not provide for a third notice (after the 30
 days have lapsed) does not call its validity into
 question. Notice matters only when there are
 choices to be made.
Id. at 598.
 Similar reasoning applies here, because Koger received
notice when he had a choice to make. Even setting aside the
Handbook, the County notiﬁed Koger days in advance of the
search that staﬀ would soon take any excess books. At that
point, Koger knew all relevant information. He could get his
books out of the Jail via mail or pickup, or he could give them
to other inmates. Koger chose none of those options, explain-
ing “There was no reason for me to get rid of the books.” As
in Streckenbach, the Constitution does not require notice be-
yond that which the County already provided.
No. 22-1194 25

 Finally, Conyers v. City of Chicago, 10 F.4th 704 (7th Cir.
2021), cert denied, 142 S. Ct. 1669 (2022), provides a guidepost
for what notice is constitutionally required prior to a property
deprivation. In Conyers, this court reviewed a City of Chicago
policy that requires oﬃcers to conﬁscate certain property
from arrestees. Id. at 706. If that property is not claimed within
30 days, the City deems it abandoned and either sells or de-
stroys it. Id. The plaintiﬀs in Conyers argued that they received
insuﬃcient notice of the policy and the destruction deadline.
Id. at 708. At the time, the City’s policy for providing notice
was to give each detainee an inventory receipt, which “in-
cluded a short note that explained the governing procedures”
and “informed the arrestee that he or she should have re-
ceived another form entitled ‘Notice to Property Owner or
Claimant.’” Id. at 707. The receipt also told detainees that they
could obtain a complete copy of the policy on the Chicago Po-
lice Department website or in person at the Chicago Police
Department facility. Id. Examining that notice framework, we
identiﬁed no due process violation based on inadequate no-
tice. Id. at 714–15. Here, Koger received even more personal-
ized and meaningful notice of the three-book policy.
 In addition to notice, Koger had an adequate chance to
protect his property interest. Kelley-Lomax v. City of Chicago, a
recent decision of ours, is instructive on this point. 49 F.4th
1124 (7th Cir. 2022). There, we again examined a City of Chi-
cago policy for handling arrestee property (apparently the
same policy at issue in Conyers). Id. at 1124–25. Under the
City’s rules, detainees were aﬀorded 30 days to reclaim the
property taken from them at time of booking. Id. at 1124. Oth-
erwise, “Property remaining in the City’s hands after 30 days
is sold or thrown away.” Id. Our decision in Kelley-Lomax pri-
marily scrutinized Fourth Amendment and substantive due
26 No. 22-1194

process considerations, but it also addressed procedural due
process. Id. at 1125. On that point, we repeated that “[t]he Due
Process Clause requires notice and an adequate opportunity to
protect one’s interests,” and recognized that the 30-day policy
is perhaps too short for detainees to get their property back.
Id. But we also concluded that “a longer time did not matter
to Kelley-Lomax,” because he did not try to retrieve his prop-
erty during his entire six months in custody. Id. Thus, the 30-
day limitation was immaterial to him. Though perhaps the
property-collection period was short, and “may matter to
other detainees,” it did not matter to Kelley-Lomax. Id. Kelley-
Lomax highlights that an aggrieved party’s own actions play
a part in the due process analysis.
 There are similarities between that reasoning and this
case. Koger contends the County did not give him a fair
chance to protect his property. He claims he had insuﬃcient
time to properly relocate his excess books. But, as with the
plaintiﬀ in Kelley-Lomax, Koger did nothing to protect his in-
terest in the books. It is not as if Koger was scrambling to re-
locate his books and simply ran out of time. He decided to
retain his books in contravention of the Jail’s noticed policy:
“[T]hey were my books. There was no reason for me to get rid
of the books.”
 Koger received adequate process surrounding the depri-
vation of his books, so the County is entitled to summary
judgment. The district court correctly reached the same con-
clusion.
 III
 Though Koger’s claim fails based on the due process anal-
ysis above, summary judgment for the County is appropriate
No. 22-1194 27

for another reason—Koger falls short of demonstrating mu-
nicipal liability. Oddly, Koger’s brieﬁng neither cites to Monell
nor comprehensively explains his theory of municipal liabil-
ity. But we interpret his arguments as an attempt to establish
municipal liability through a “gap in policy” theory. He
agrees that “the jail did not have any formal policy (written or
unwritten) regarding what is to be done with books conﬁs-
cated pursuant to the jail’s three-book/magazine policy,” and
argues that such an omission subjects the Jail to liability.
Namely, Koger asserts that “written policies were and are
necessary here because they are a protection against willy-
nilly destruction of inmates’ personal property.” By refusing
to implement a policy on how conﬁscated books were to be
handled, Koger believes the Jail “create[d] a serious risk that
inmates will be deprived of their property without due pro-
cess.” The County disputes municipal liability, contending
Koger identiﬁes no actionable policy or custom and falls short
of proving fault and causation.
 In our evaluation of Koger’s procedural due process claim
above, we assumed that Koger suﬀered a deprivation and that
the County caused it. Now that we turn to the question of mu-
nicipal liability, our inferences change. Because of the proce-
dural posture, we continue to assume that Jail staﬀ destroyed
Koger’s books in the manner alleged. But at this point we no
longer take for granted that the County is responsible for the
loss of Koger’s books; instead, we examine the record for evi-
dence that the culpable Jail staﬀ acted pursuant to a Monell
“policy or custom.”
 Because Koger is suing a municipality, it is not suﬃcient
for him to merely demonstrate a valid due process violation.
He must go a step further and show the municipality itself is
28 No. 22-1194

liable for the harm he suﬀered. Monell, 436 U.S. at 690–91, 694.
Municipalities are suable “persons” for purposes of § 1983,
but they may only be held liable for their own wrongs. Id. at
690. As such, a municipality is not vicariously liable for the
conduct of its employees. Bd. of Cnty. Comm’rs of Bryan Cnty.
v. Brown, 520 U.S. 397, 403 (1997) (“We have consistently re-
fused to hold municipalities liable under a theory of re-
spondeat superior.”). Indeed, “a local government may not be
sued under § 1983 for an injury inﬂicted solely by its employ-
ees or agents. Instead, it is when execution of a government’s
policy or custom … inﬂicts the injury that the government as
an entity is responsible under § 1983.” Monell, 436 U.S. at 694.
So, “The central question is always whether an oﬃcial policy,
however expressed … caused the constitutional deprivation.”
Glisson v. Ind. Dep’t of Corr., 849 F.3d 372, 379 (7th Cir. 2017)
(en banc).
 We have identiﬁed “three requirements to establish a Mo-
nell claim—policy or custom, municipal fault, and ‘moving
force’ causation.” Bohanon v. City of Indianapolis, 46 F.4th 669,
676 (7th Cir. 2022). Starting with policy or custom, three kinds
of municipal action support Monell liability: “(1) an express
policy that causes a constitutional deprivation when enforced;
(2) a widespread practice that is so permanent and well-set-
tled that it constitutes a custom or practice; or (3) an allegation
that the constitutional injury was caused by a person with ﬁ-
nal policymaking authority.” Id. at 675 (quoting Spiegel v.
McClintic, 916 F.3d 611, 617 (7th Cir. 2019). Plus, “[i]naction
can also give rise to liability if it reﬂects the municipality’s
‘conscious decision not to take action.’” Id. (quoting Glisson,
849 F.3d at 381).
No. 22-1194 29

 In addition to a policy or custom, a Monell plaintiﬀ must
also show municipal fault. Id.; Bryan County, 520 U.S. at 404.
This requirement is “easily established when a municipality
acts, or directs an employee to act, in a way that facially vio-
lates a federal right.” Bohanon, 46 F.4th at 675 (citation omit-
ted). But a plaintiﬀ’s route becomes more diﬃcult when he
alleges only “that the municipality caused an employee to vi-
olate a federal right.” Id. “Where a plaintiﬀ claims that the
municipality has not directly inﬂicted an injury, but nonethe-
less has caused an employee to do so, rigorous standards of
culpability and causation must be applied to ensure that the
municipality is not held liable solely for the actions of its
employee.” Bryan County, 520 U.S. at 405. Under those circum-
stances, “[t]he plaintiﬀ must demonstrate that the municipal-
ity itself acted with ‘deliberate indiﬀerence’ to [the plaintiﬀ’s]
constitutional rights.” Bohanon, 46 F.4th at 675 (quoting Bryan
County, 520 U.S. at 407); see also Taylor v. Hughes, 26 F.4th 419,
435 (7th Cir. 2022). This is a high bar. As the Supreme Court
explains, “‘[d]eliberate indiﬀerence’ is a stringent standard of
fault, requiring proof that a municipal actor disregarded a
known or obvious consequence of his action.” Connick v.
Thompson, 563 U.S. 51, 61 (2011) (quoting Bryan County, 520
U.S. at 410).
 Finally, a plaintiﬀ seeking to hold a municipality liable
must show causation. “That is, a plaintiﬀ must show that the
municipal action was taken with the requisite degree of cul-
pability and must demonstrate a direct causal link between
the municipal action and the deprivation of federal rights.”
Bryan County, 520 U.S. at 404; Bohanon, 46 F.4th at 675 (“[A]
plaintiﬀ bringing a Monell claim must prove that the munici-
pality’s action was the ‘moving force’ behind the federal
rights violation.”) (citation omitted).
30 No. 22-1194

 With that, we turn to municipal liability in Koger’s case.
Koger points to the three-book policy as causing him injury
and giving rise to municipal liability. But we have already
held the policy constitutional, Koger, 950 F.3d at 974, so Koger
cannot claim that the County’s “aﬃrmative municipal action
is itself unconstitutional.” J.K.J. v. Polk County, 960 F.3d 367,
377 (7th Cir. 2020) (en banc). Instead, Koger must travel the
more diﬃcult liability route and show that the “municipality
caused an employee to violate a federal right.” Bohanon, 46
F.4th at 675. For that, Koger turns to a “gap in policy” liability
theory. Koger suggests that—by creating the three-book pol-
icy without any accompanying instructions for how oﬃcers
are to deal with conﬁscated books—the County was deliber-
ately indiﬀerent to the constitutional property rights of Jail in-
mates. “The door is left open for guards to do whatever they
want with inmates’ property,” says Koger.
 As indicated, “municipal liability can be premised, as
here, on municipal inaction, such as ‘a gap in express poli-
cies.’” Id. at 676 (quoting Daniel v. Cook County, 833 F.3d 728,
734 (7th Cir. 2016)). Indeed, a municipality can be held liable
when it “has knowingly acquiesced in an unconstitutional re-
sult of what its express policies have left unsaid.” Taylor, 26
F.4th at 435 (citation omitted); see also Daniel, 833 F.3d at 734
(“An unconstitutional policy can include both implicit policies
as well as a gap in expressed policies.”) (citation omitted). Yet
while “gap in policy” liability is possible, it entails unique
concerns and stringent requirements. We have cautioned “the
path to Monell liability based on inaction is steeper because,
unlike in a case of aﬃrmative municipal action, a failure to do
something could be inadvertent and the connection between
inaction and a resulting injury is more tenuous.” J.K.J., 960
F.3d at 378; see also Calhoun v. Ramsey, 408 F.3d 375, 380 (7th
No. 22-1194 31

Cir. 2005) (“At times, the absence of a policy might reﬂect a
decision to act unconstitutionally, but the Supreme Court has
repeatedly told us to be cautious about drawing that infer-
ence.”). So, “[a] gap in policy ‘amounts to municipal action for
Monell purposes only if the [municipality] has notice that its
program will cause constitutional violations.’” Bohanon, 46
F.4th at 676 (quoting J.K.J., 960 F.3d at 379). “Demonstrating
that notice is essential to an ultimate ﬁnding and requires a
‘known or obvious’ risk that constitutional violations will oc-
cur.” J.K.J., 960 F.3d at 379–80 (citing Bryan County, 520 U.S. at
410).
 This means Koger must show the County had notice that
its gap in policy would cause constitutional violations and
was deliberately indiﬀerent to that risk. Bohanon, 46 F.4th at
675. Koger can demonstrate the requisite notice in either of
two ways. He can show a pattern of constitutional violations
such that the County was put on notice of the constitutional
harm its gap in policy was causing. Id. at 676–77; see also J.K.J.,
960 F.3d at 380 (“In many Monell cases notice requires proof
of a prior pattern of similar constitutional violations.”) (cita-
tion omitted). Or he can show that the risk of a constitutional
violation under the County’s existing three-book policy was
so high as to be obvious. J.K.J., 960 F.3d at 380 (“[A] risk of
constitutional violations can be so high … that the municipal-
ity’s failure to act can reﬂect deliberate indiﬀerence and allow
an inference of institutional culpability, even in the absence of
a similar prior constitutional violation.”).
 Option one is closed to Koger, as there is no record evi-
dence showing an actionable pattern of similar constitutional
violations. The testimony and declarations in the record show
the three-book policy was rarely enforced and oﬀer no
32 No. 22-1194

evidence of repeated book or magazine destruction. See, e.g.,
Martinez Declaration (“During my time at the jail, I have only
rarely seen this rule enforced against inmates.”); Collins Dec-
laration (“I have only heard of a three-book-or-magazine rule
being enforced three times in the years I have been in the Cook
County Jail.”); Washington Declaration (“I have only heard of
the three-book rule on one other occasion in early 2014 … .
However, no one conﬁscated extra books or magazines at that
time.”); Roman Declaration (“In my whole time at the jail, I
have seen the rule enforced three times … .”). Sergeant Giunta
likewise testiﬁed that enforcement of the policy is rare. When
asked how many times he has enforced the three-book rule,
he answered, “Maybe three or four times in the last two
years.”
 Koger thus presents evidence of the County enforcing the
policy just a few times in a multi-year span, let alone book or
magazine destruction. This evidence does not, as a matter of
law, establish municipal notice via a pattern. See Connick, 563
U.S. at 62 (rejecting evidence of four Brady violations in ten
years as insuﬃcient to put the prosecutor’s oﬃce on notice
that extra training was needed to avoid constitutional viola-
tions); see also Hildreth v. Butler, 960 F.3d 420, 430 (7th Cir.
2020) (examining the related question of how many violations
are necessary to establish an unconstitutional municipal cus-
tom and holding that three potential violations over nineteen
months “does not establish a widespread custom or prac-
tice”). 9

 9 We note also that Koger does not pursue a municipal liability theory

based on repeated constitutional violations. He acknowledges that he
No. 22-1194 33

 That leaves Koger with option two—demonstrating that
the risk of unconstitutional property deprivation under the
County’s policies was so high as to be obvious. J.K.J., 960 F.3d
at 380. Here, too, Koger comes up short. Qualifying circum-
stances under this doctrine are rare, and this is not one of
those cases. See Bohanon, 46 F.4th at 677 (explaining that the
range of cases “where notice can be inferred from the
obviousness of the consequences of failing to act” is narrow)
(citation omitted). It was not “blatantly obvious” that imple-
menting the three-book policy without providing additional
guidance to correctional oﬃcers would result in constitu-
tional violations. Id. Without more, the bare fact that a policy
authorizes conﬁscation does not create an imminent risk that
Jail staﬀ will unconstitutionally destroy that property. We
also emphasize it is not suﬃcient for Koger to show that a pol-
icy could conceivably or potentially lead to a constitutional
violation. See Bryan County, 520 U.S. at 410–11 (explaining that
municipal inaction that merely makes “a violation of rights
more likely” cannot alone show liability). A constitutional vi-
olation must be a “blatantly obvious” consequence of inaction
for single-incident liability, Bohanon, 46 F.4th at 677, and
Koger cannot make that showing here.
 This case closely resembles Bohanon, where we reviewed a
§ 1983 claim built around a gap in policy liability theory. 46
F.4th at 676–77. There, two oﬀ-duty oﬃcers were celebrating
at a bar when patron Bohanon got into an altercation with a
bartender. Id. at 671–72. Though the oﬃcers had been drink-
ing, they identiﬁed themselves as law enforcement and inter-
vened. Id. at 672–73. The oﬃcers badly beat Bohanon and

“does not make a widespread practice claim in this case.” Appellant Reply
Br. at 5.
34 No. 22-1194

allegedly robbed him. Id. Bohanon sued the oﬃcers and the
City of Indianapolis. Id. at 674. The City’s policies generally
prohibited intoxicated oﬃcers from performing law enforce-
ment functions but contained a narrow exception allowing
them to do so in an “extreme emergency situation[].” Id. at
672, 676. Bohanon seized on the emergency exception, argu-
ing that “‘gap’ in the policy led to the ‘highly predictable’ out-
come of his assault.” Id. at 676. For Bohanon, “any exception
permitting oﬀ-duty oﬃcers to take police action with alcohol
in their blood demonstrates that the City was deliberately in-
diﬀerent to the obvious risk of constitutional violations based
on police use of excessive force.” Id. Yet all agreed that no sim-
ilar incident had ever happened before, so Bohanon had to
establish single-incident liability. Id. at 677.
 We held that the City was not liable as a matter of law,
concluding that Bohanon could show neither municipal lia-
bility nor causation. Id. at 677. On the former point, we deter-
mined that “the City’s substance-abuse policy did not present
a policy ‘gap’ that made it glaringly obvious that oﬀ-duty of-
ﬁcers would use excessive force.” Id. at 672. To the contrary,
“[n]othing about the text of [the policy] alone put the City on
notice that constitutional violations of this kind were likely to
occur.” Id. at 677. The same reasoning applies here. The three-
book policy did not present a glaring risk of constitutional
violation such that the Jail should have been on notice of im-
pending harm even with no pattern of past violations. The
summary destruction of inmate reading materials does not
naturally and imminently follow from the three-book policy.
Because Koger does not demonstrate municipal fault, a re-
quired element, we decline to weigh in on causation. Id. at 676.
No. 22-1194 35

 IV
 Procedural due process is “ﬂexible and calls for such pro-
cedural protections as the particular situation demands.”
Morrissey, 408 U.S. at 481. The ﬂexibility of procedural due
process “is a recognition that not all situations calling for pro-
cedural safeguards call for the same kind of procedure.” Id.
The County aﬀorded Koger constitutionally adequate proce-
dure given the context. “The essential requirements of due
process … are notice and an opportunity to respond.”
Loudermill, 470 U.S. at 546. Koger had the beneﬁt of both. He
had notice. The County notiﬁed Koger of the three-book pol-
icy upon his entry to the Jail. Jail administrators then pro-
vided additional warning that they were soon coming to take
Koger’s excess books. Koger had an opportunity to respond.
He could have mailed his books out of the Jail, had them
picked up, or given them away. Koger elected not to act.
Koger could have also ﬁled a grievance but decided against it.
Therefore, even if the County is responsible for depriving
Koger of his books as alleged, we ﬁnd no constitutional viola-
tion.
 We also conclude that Koger cannot establish municipal
liability even if his procedural due process claim were sound.
He complains of a gap in the County’s policies but provides
evidence of only a single possible constitutional violation.
With no evidence of a pattern of similar constitutional viola-
tions, this court is left having to infer that the severity of the
policy gap itself put the County on notice. We decline to hold
that the three-book policy is the type of policy that makes a
constitutional violation blatantly obvious.
 For these reasons, the judgment of the district court is
AFFIRMED.